[No. 60781-8. En Banc. October 12, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. SAMMIE LEE LUVENE, *Appellant*.

*Nance & Iaria*, by *Michael P. Iaria*, and *Charlotte Cassady* for appellant.

*John W. Ladenburg, Prosecuting Attorney*, and *Barbara L. Corey-Boulet* and *Thomas C. Roberts, Deputies*, for respondent.

*Sammie L. Luvene*, pro se.

UTTER, J.* — Sammie Lee Luvene was convicted by a jury in Pierce County Superior Court of aggravated first degree murder, attempted first degree murder, and first degree robbery while armed with a deadly weapon. A special sentencing proceeding was held and Mr. Luvene

---

*Justice Robert F. Utter is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a) (amend. 38).

was sentenced to death. This case is now before us on direct review of Mr. Luvene's death sentence. We affirm Mr. Luvene's conviction and overturn the sentence of death based upon the State's failure to file notice of intent to seek the death penalty within the thirty-day period required by RCW 10.95.040(2). The State had an order prepared within the statutory period and the opportunity to file it timely in the superior court. It failed to do so through simple inadvertence and, therefore, cannot show good cause for its failure as is required by our decision in *State v. Dearbone*, 125 Wn.2d 173, 883 P.2d 303 (1994). The case is remanded for resentencing to life imprisonment without the possibility of release or parole.

FACTS

On July 2, 1992, Carrol "Bud" Bond and Margaret Detrick were shot during a robbery at the Milton liquor store in Pierce County where they were employed. The crime took place at approximately 7 P.M., just after closing time. According to the testimony, the assailant entered the store at least fifteen minutes earlier while several customers were making purchases. As other customers lingered in the store, the assailant placed his order for several bottles of alcohol. By the time the order had been bagged, the assailant was the only customer left in the store.

Ms. Detrick testified that she saw the assailant raise a black gun and shoot Mr. Bond twice. Ms. Detrick immediately fell to the floor and huddled in a crouched position. As she was on the floor, she was shot twice in the chest.

As Ms. Detrick pretended to be dead, the assailant jumped over the counter and attempted to open the cash register. Realizing he could not open it, the assailant took the entire register and left the store. He then returned and took the bottles of liquor he had ordered.

When Ms. Detrick heard a car drive away, she crawled to a telephone and called the police. The police arrived within thirty seconds; at 7:07 P.M. Ms. Detrick was found

conscious and talking, but Mr. Bond appeared dead. When the aid crew from the fire department arrived shortly thereafter, they found a pulse on Mr. Bond, but it was soon lost and he died. Ms. Detrick described the assailant to the police as a stocky black male, approximately five feet seven inches tall, with big lips, and wearing a green shirt.

An intensive police investigation led them to suspect Sammie Lee Luvene. The police placed Mr. Luvene's picture in a photo montage and showed it to Ms. Detrick on July 8, 1992. She identified Mr. Luvene as the perpetrator of the crime, although she had earlier described the perpetrator as having longer hair than Mr. Luvene had in the photo. The police also showed the photo montage to Clifford Smith, one of the last customers to leave the store before the crime, and he also identified Mr. Luvene.

The next day, the police conducted a search of Mr. Luvene's apartment where he lived with his girlfriend, Billie Pickett, and her daughter, D'Tisha Pickett. The police found four bottles of liquor that matched the type stolen from the Milton liquor store. They also found two unfired .380 cartridges in D'Tisha Pickett's bedroom. The police, however, were unable to find any clothes matching those described by witnesses as having been worn by the assailant. Nor did they find the missing cash register or the gun used in the crime. Following the search, the police arrested Mr. Luvene at a nearby video store.

The trial began on April 5, 1993. The jury heard testimony from Ms. Detrick and three other witnesses who identified Mr. Luvene as the assailant. Billie and D'Tisha Pickett each testified that Luvene owned a black gun near the time of the crime, and Dalton "Dray" Gamboa, a neighbor, testified that Mr. Luvene had told him he had a .380-caliber handgun. A firearms expert testified that one of the cartridges found in Luvene's apartment had been cycled through the same gun as the three shell casings found at the crime scene. The jury also heard evidence that the manufacturer's lot numbers on the liquor

bottles found in Mr. Luvene's apartment matched the lot numbers found in the inventory of the Milton liquor store, but there were no matching lot numbers found at the store where Mr. Luvene claimed the liquor was purchased. There was testimony from two witnesses who saw a car at the scene of the crime that may have been a black GEO Storm, and further testimony that Mr. Luvene was seen on the day of the crime driving Billie Pickett's black GEO Storm. Finally, the jury heard evidence concerning the unusually large amount of money Mr. Luvene suddenly possessed in the days following the crime.

The defense case focused primarily on a theory of mistaken identity. The defense emphasized the discrepancies between the descriptions of the assailant initially given to police and the uncontroverted testimony regarding Mr. Luvene's actual appearance at the time of the crime. The most significant discrepancy was that while Mr. Luvene apparently always has worn his hair very short, several of the witnesses, including Ms. Detrick, initially described the assailant as having long hair. Two of the witnesses indicated the assailant had a "geri-curl" hairstyle. The defense also attempted to create a reasonable doubt concerning Mr. Luvene's guilt by implying that either Dalton Gray or Bernard Burns, D'Tisha Pickett's boyfriend, committed the crime.

On May 21, 1993, the jury found Mr. Luvene guilty of premeditated first degree murder with a robbery aggravating factor, attempted first degree murder, and first degree robbery while armed with a deadly weapon. The special sentencing proceeding began on June 16, 1993. Numerous friends and relatives testified that Mr. Luvene had a difficult upbringing but was a kind and caring person who had never before exhibited any violent tendencies. In addition, Margaret Detrick, the liquor store clerk who survived the shooting, testified that she wanted Mr. Luvene to be sentenced to life imprisonment without the possibility of parole. On June 20, 1993, after three days of

deliberation, the jury returned its verdict, and on August 12, 1993, the trial court sentenced Mr. Luvene to death.

### RIGHT TO SELF-REPRESENTATION AND SPEEDY TRIAL

Mr. Luvene's trial was initially scheduled to begin on March 8, 1993. On February 18, 1993, the trial court granted a continuance at the request of Mr. Luvene's attorney, Rogers Wilson. Mr. Wilson indicated that he needed additional time to interview witnesses and to begin preparation for the penalty phase. Mr. Luvene, however, strongly opposed any continuance, stating:

> I've been here since July. . . . You know, I don't wanna sit here any longer. It's me that has to deal with this. If I'm prepared to go for myself, then that's me. You know, can't nobody tell me what I wanna do. They say I did this, so why not — if I wanna go to trial, why can't I go to trial on the date they have set for my life? I'm prepared. I'm not even prepared about that. I wanna go to trial, sir. . . .

> I don't wanna extend my time. This is out of my league for doing that. I do not want to go. If he's not ready to represent me, then forget that. But I want to go to trial on this date.

Report of Proceedings at 72-73. Mr. Luvene contends that these statements represent an unequivocal request to proceed pro se and that by granting the continuance, the trial court denied him his state and federal constitutional rights to self-representation.

■ The right of criminal defendants to self-representation is guaranteed by the Sixth and Fourteenth Amendments to the Federal Constitution and article I, section 22 of the state constitution. *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State v. Bebb*, 108 Wn.2d 515, 524, 740 P.2d 829 (1987). However, the assertion of the right to proceed pro se must be unequivocal. *Bebb*, 108 Wn.2d at 524 (citing *State v. Fritz*, 21 Wn. App. 354, 360-61, 585 P.2d 173, 98 A.L.R.3d 1 (1978), *review denied*, 92 Wn.2d 1002 (1979)).

While Mr. Luvene did state that he was "prepared to go

for myself," he also stated, "I'm not even prepared about that," and "[t]his is out of my league for doing that." Taken in the context of the record as a whole, these statements can be seen only as an expression of frustration by Mr. Luvene with the delay in going to trial and not as an unequivocal assertion of his right to self-representation.

■ Mr. Luvene also argues that by granting the continuance, the trial court denied him his right to a speedy trial. We have previously held, however, that a trial court may grant a continuance to allow the defense counsel opportunity to prepare for trial over the express objections of a defendant. *State v. Campbell*, 103 Wn.2d 1, 14-15, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985). The trial court, therefore, committed no error in granting the continuance.

## Exercise of Peremptory Challenge on the Basis of Race

Mr. Luvene argues that the prosecutor's exercise of a peremptory challenge against one of the two African-Americans in the venire was done so on the basis of race and thereby violated Mr. Luvene's right to equal protection.

■■ The use of a peremptory challenge by the prosecutor on the basis of race violates a defendant's right to equal protection. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). In order to contest a peremptory challenge, the defendant must first make out a prima facie case of racial motivation. The burden then shifts to the State to articulate a race-neutral explanation for the exercise of the peremptory challenge. *Batson*, 476 U.S. at 96-98. However, if, as in this case, the prosecutor has offered a race-neutral explanation and the trial court has ruled on the question of racial motivation, the preliminary prima facie case is unnecessary. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). The determination of the trial judge is "accorded great deference on appeal," and will be upheld unless clearly erroneous. *Hernandez*, 500 U.S. at 364.

Upon exercising the peremptory challenge, the prosecutor immediately offered two race-neutral explanations, presumably for the purpose of avoiding a *Batson* challenge. He stated that the challenged juror's brother had been convicted of an armed robbery and had been committed to the Washington Department of Corrections. He also noted that the challenged juror was very vague on the topic of the death penalty. The prosecutor indicated he felt, based on the juror's body language, that he was attempting to avoid answering questions about the death penalty. Finally, the prosecutor mentioned that he did not intend to exercise a peremptory challenge against the other African-American person in the venire.

The trial court overruled the Defendant's objection to the peremptory challenge, finding that the reasons for the challenge given by the prosecutor were race neutral. The trial court specifically stated that the challenged juror

> answered very, very defensively on the questions concerning the death penalty. As a matter of fact, his defensiveness in my mind, and I'm mak[ing] a finding of fact, was just that he said he simply didn't care to state his views publicly on how he felt about the use of the death penalty in this state. I'm satisfied that that is clearly a race neutral reason for excusing [the juror] in this case, and the *Batson* challenge is denied.

Report of Proceedings, vol. 8, at 1174.

Mr. Luvene notes that the prosecutor did not challenge four jurors in the venire who had relatives with criminal histories, nor did he challenge other jurors who were neutral or ambivalent on the issue of the death penalty. However, as the State points out, no jurors other than the one challenged had both traits.

■ "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Hernandez*, 500 U.S. at 369 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)). In the present case, the reasons given by the prosecutor for the peremptory chal-

lenge, taken as a whole, support the trial court's decision that the prosecutor's motivation was race neutral. Thus, because it was not clearly erroneous, we uphold that determination.

### Prosecutorial Misconduct

Mr. Luvene alleges several instances of prosecutorial misconduct during the guilt phase of the trial. These include: introduction of false rebuttal evidence regarding Mr. Luvene's possession of a weapon; failure to disclose information regarding a gun taken from Mr. Luvene's apartment; and failure to inform the defense of the location and expected testimony of Dalton Gamboa.

█ █ In a claim of prosecutorial misconduct, the defendant bears the burden of establishing that the conduct complained of was both improper and prejudicial. *State v. Mak*, 105 Wn.2d 692, 726, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986). The conviction will be reversed only if "there is a substantial likelihood that the alleged prosecutorial misconduct affected the verdict." *State v. Lord*, 117 Wn.2d 829, 887, 822 P.2d 117 (1991), *cert. denied*, 113 S. Ct. 164 (1992). A trial court ruling on prosecutorial misconduct will be given deference on appeal. "The trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced a defendant's right to a fair trial." *Lord*, 117 Wn.2d at 887.

The record indicates that Mr. Luvene owned a silver .32-caliber handgun which was confiscated by the police in February 1992. There was also testimony that Mr. Luvene possessed a black automatic handgun on or around July 2, 1992, which was similar to the .380-caliber handgun used in the robbery of the Milton liquor store.

Prior to the commencement of the trial, the Defendant made a motion in limine to suppress "any and all statements that the defendant either did or did not possess a gun, either before or after 7/2/92," apparently referring to any gun "other than one specifically determined to be the murder weapon." Clerk's Papers at 307. The trial court

denied the motion and permitted the prosecutor to elicit testimony that Mr. Luvene owned a .380-caliber automatic handgun. Report of Proceedings, vol. 12, at 1637. The court did, however, rule inadmissible two pieces of evidence regarding the possession of firearms by Mr. Luvene: (1) evidence that he shot a handgun from his apartment balcony, and (2) a box of .32-caliber bullets found in Mr. Luvene's apartment. During the discussions of the various motions relating to the handguns, the prosecutor at least twice stated that the State had no intention of bringing in evidence of the .32-caliber handgun unless the issue was somehow raised by the defense. Report of Proceedings, vol. 12, at 1693; Report of Proceedings, vol. 13, at 1767. Both the defense and the trial judge accepted these assurances.

During the course of the trial, several witnesses testified that they saw Mr. Luvene with a black gun that matched the description of a .380-caliber automatic handgun both before and after the robbery occurred. Additionally, a firearms expert testified that a live .380 cartridge recovered from Mr. Luvene's apartment had been "cycled" through the same gun as the bullet shell casings found at the Milton liquor store.

The defense, in support of its theory that D'Tisha Pickett's boyfriend had burglarized Mr. Luvene's apartment and taken the .380 handgun prior to the Milton liquor store robbery, called Lisa Bell, a friend of D'Tisha Pickett. Ms. Bell testified that on or around July 2, 1992, she saw D'Tisha Pickett return a gun to the bedroom used by Mr. Luvene and that Ms. Pickett told her that she had to return the gun because her boyfriend had it. She described the gun as being silver in color. The defense then recalled D'Tisha Pickett, who denied that the gun ever left Mr. Luvene's possession. On cross-examination, the prosecutor elicited testimony that Mr. Luvene possessed two guns, first a silver one and then a black one, that the time when a gun was supposedly missing was "weeks or months" before July 2, 1992, and that if any gun was missing, it

may have been the silver one. The State thereafter called Billie Pickett as a rebuttal witness who testified that Mr. Luvene had possessed two guns, one silver and one black. She also testified that no gun was ever stolen from the apartment she shared with Mr. Luvene.

The defense then moved for a mistrial, arguing that the State intentionally misled the jury by introducing the issue of a second gun and suggesting that even if D'Tisha Pickett's boyfriend had taken a gun, it was a different gun than the one used in the robbery. The defense claimed that the prosecutor tried to show that Mr. Luvene possessed a silver gun around the time of the robbery, even though the prosecutor knew that the police had seized this gun in February 1992.

The trial judge denied the motion, noting that it was a defense witness, Lisa Bell, who first introduced the idea of a silver gun.

> I don't think the prosecutor intentionally tried to introduce this issue concerning silver, and I don't think the prosecutor can be blamed for any of the confusion that the jury now is facing, and I think the prosecutor is entitled to put on evidence to try and clear up the confusion for the jury. That's all the prosecutor did.

Report of Proceedings, vol. 23, at 3103.

Once the defense witness testified about a silver gun, it was not misconduct for the prosecutor to attempt to distinguish the silver gun from the black gun as long as the prosecutor was not attempting to show Mr. Luvene had the silver gun after February 1992, when, as the prosecutor knew, the silver gun was confiscated by the police. *See State v. Ferguson*, 100 Wn.2d 131, 667 P.2d 68 (1983) (discussing the permissible scope of cross-examination). The record does not support Mr. Luvene's claim that the State was attempting to show that he possessed the silver gun after February 1992. Moreover, Mr. Luvene has failed to establish the prosecutor's conduct was prejudicial. Keeping in mind the high degree of defer-

ence with which we review a trial court's ruling on pros-
ecutorial misconduct, we uphold the trial court's refusal
to grant a mistrial for the prosecutor's conduct in eliciting
testimony concerning a second gun.

As a related matter, Mr. Luvene contends that the
prosecutor committed misconduct by not disclosing before
the trial information that a gun was allegedly removed
from Mr. Luvene's apartment at some point prior to the
robbery of the Milton liquor store.

■ Failure by the State to reveal exculpatory evidence
violates a defendant's due process rights. *Brady v. Mary-
land*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215
(1963). However, as the State points out, the record in this
case makes it clear the defense already knew this infor-
mation. Several of the witnesses called during the defense
case in chief repeatedly referred to the alleged burglary of
Mr. Luvene's apartment by D'Tisha Pickett's boyfriend.
Even if the prosecutor did improperly fail to disclose this
information, it was harmless error and resulted in no prej-
udice to the Defendant. *See State v. Mitchell*, 117 Wn.2d
521, 537, 817 P.2d 398 (1991).

Mr. Luvene also argues that the prosecutor committed
misconduct by failing to inform the defense of the location
and expected testimony of Dalton Gamboa. Mr. Gamboa
testified that approximately one month before the crime,
Mr. Luvene lifted his shirt and told him that he had a
.380-caliber handgun, and that he saw a "black object."
Report of Proceedings, vol. 21, at 2762, 2779. Mr. Gamboa
also testified that, contrary to Mr. Luvene's claim, he
never asked Mr. Luvene to keep liquor at his apartment
for him.

Mr. Luvene's claim that he had no notice that Mr. Gam-
boa would be called as a witness appears somewhat
disingenuous. Mr. Gamboa's statements appeared in po-
lice reports which were given to the defense during
discovery. Moreover, Mr. Gamboa's name appeared on the
State's list of witnesses. Clerk's Papers at 103.

Nevertheless, the defense did appear to be somewhat

surprised by the appearance of Mr. Gamboa as a witness for the State. By September 1992, Mr. Gamboa had apparently moved to Los Angeles and the State had difficulty in locating him. At the end of March 1993, Mr. Gamboa contacted the prosecutor's office. After several attempts by the State to obtain Mr. Gamboa as a witness, he finally arrived in Pierce County to testify on May 10, 1993. The defense requested an hour recess to confer with Mr. Gamboa. Following the recess, the defense requested, and the court granted, a continuance of one and one-half days. Report of Proceedings, vol. 20, at 2748. The defense indicated on May 11 that they would be ready to proceed the following morning and did not need any additional time to prepare. Report of Proceedings, vol. 20, at 2751. Mr. Gamboa testified on May 12, 1993, without any objection from the defense.

Thus, even if the prosecution failed to divulge discovery concerning Mr. Gamboa, the trial court remedied any violation by granting the continuance and allowing the defense to adequately prepare for the testimony. *See State v. Smith*, 67 Wn. App. 847, 851-52, 841 P.2d 65 (1992), *review denied*, 121 Wn.2d 1019 (1993).

Finally, Mr. Luvene contends that the State committed a discovery violation by failing to provide the defense with information that a green car was seen near the robbery scene around the time of the crime. While *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct 1194, 10 L. Ed. 2d 215 (1963) requires prosecutors to provide the defense with exculpatory evidence, Mr. Luvene offers no proof that the green car was connected to the crime or that the prosecutor acted improperly. Moreover the record suggests that the defense may have discovered the information regarding this car independently. *See, e.g.*, Report of Proceedings, vol. 15, at 1977, 1982. Mr. Luvene has failed to meet his burden of showing that he was prejudiced by any failure by the prosecutor to disclose this in-

formation. *See State v. Mitchell*, 117 Wn.2d 521, 537, 817 P.2d 398 (1991).

## LIQUOR SURVEY EVIDENCE

Mr. Luvene argues that the trial court erred in admitting into evidence a survey of manufacturers' lot numbers on liquor bottles from the inventory of Pierce and South King County liquor stores. The survey indicated that while the lot numbers on all four of the bottles recovered from Mr. Luvene's apartment matched lot numbers found at the Milton liquor store, none of the lot numbers matched the inventory in the store where he claimed he bought the liquor.[1]

Mr. Luvene argues that the survey was not relevant because: (1) it took place approximately nine days after the robbery and thus failed to account for intervening sales or delivery at each liquor store; (2) the police failed to survey every liquor store in the area; and (3) the State failed to offer adequate testimony that bottles bearing the same lot numbers were shipped in groups. The trial court ruled that these criticisms went to the weight of the evidence rather than its relevance. Report of Proceedings, vol. 19, at 2651. Mr. Luvene further maintains that even if the survey is relevant, it was unfairly prejudicial since it falsely purported to have a mathematical or scientific precision and thus had the tendency to mislead the jury.

In order to be admissible, evidence must be relevant. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." ER 401. Even if relevant, however, evidence may still be excluded if its probative value is substantially outweighed by the likelihood it will mislead the jury. ER 403. We review a trial court's evalu-

---

[1]The Milton liquor store was the only store with four matches. Ten stores, including the store where Mr. Luvene said he purchased the liquor, had no matches; nine stores had one match, one store had two matches, and a liquor store in Puyallup had three matches.

ation of relevance under ER 401 and its balancing of probative value against its prejudicial effect or potential to mislead under ER 403 with a great deal of deference, using a "manifest abuse of discretion" standard of review. *State v. Russell*, 125 Wn.2d 24, 78, 882 P.2d 747 (1994).

At the trial, a purchasing agent for the Washington State Liquor Control Board testified that a lot number refers to "a production batch at the bottling plant" and is used for quality control purposes. Report of Proceedings, vol. 19, at 2633-34. Liquor is stored at a warehouse which receives and distributes orders for alcohol in the state. When a liquor store submits an order, the order is filled without regard to lot number. Nevertheless, because liquor bottles are shipped by the box, and each box contains liquor bottles with the same lot number, the liquor survey evidence has at least some tendency to make the inference that the liquor found in Mr. Luvene's apartment came from the Milton liquor store "more probable . . . than it would be without the evidence." ER 401.

█ Moreover, the record does not support Mr. Luvene's contention that the liquor survey evidence had an aura of mathematical or scientific precision that misled the jury. The testimony regarding the survey did not involve any scientific or probability analysis. The chart that was used simply listed the liquor stores that were surveyed and any matching lot numbers at each store.

Since the trial court has wide discretion in determining whether evidence will mislead the jury, *Myers v. Harter*, 76 Wn.2d 772, 781, 459 P.2d 25 (1969), and we review this balancing under ER 403, as well as the determination of relevance under ER 401, under a "manifest abuse of discretion" standard, we cannot conclude that the trial court abused its discretion in admitting the liquor survey evidence.

### ADMISSION OF OTHER EVIDENCE

Mr. Luvene also challenges the admission of various other pieces of evidence by the trial court. Several of these

challenges relate to evidence of Mr. Luvene's possession of a gun and the admission of the .380-caliber cartridges recovered from his apartment. Other challenges are to evidence that Mr. Luvene suddenly possessed uncharacteristically large amounts of money in the days following July 2, 1992.

First, Mr. Luvene argues that the trial court erred in denying his motion to exclude both evidence that he possessed a gun either before or after the crime occurred and evidence of his possession of guns which were not first identified as the murder weapon. He also argues that it was error to admit evidence that he encouraged Billie Pickett to fire his black handgun on the night of July 2, 1992.

The victims of this crime were shot with a weapon identified as a black .380-caliber handgun. Thus, any evidence that Mr. Luvene possessed such a weapon around the time of the crime is highly relevant under ER 401 and 402. Although evidence of weapons entirely unrelated to the crime is inadmissible, *State v. Jeffries*, 105 Wn.2d 398, 412, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986), if the jury could infer from the evidence that the weapon could have been used in the commission of the crime, then evidence regarding the possession of that weapon is admissible. *See Jeffries*, 105 Wn.2d at 412. The trial court, therefore, did not abuse its discretion in admitting this evidence.

Similarly, in light of the fact that the .380 cartridges recovered from Mr. Luvene's apartment matched the caliber of those used in the robbery, and one of them was cycled through the same firearm used in the robbery, the cartridges are highly relevant. The trial court was well within its discretion in ruling that the fact that they were found in D'Tisha Pickett's bedroom rather than the bedroom used by Mr. Luvene goes to the weight of the evidence rather than its admissibility. The trial court did not err in admitting this evidence.

Mr. Luvene also contends that the trial court erred in

admitting evidence of Mr. Luvene's sudden accumulation of wealth around the time of the robbery. The jury heard testimony during the trial that (1) Billie Pickett was unable to pay her rent prior to July 2, 1992, but was able to after that date; (2) Mr. Luvene gave $400 to Ms. Pickett to deposit in her credit union after July 2, 1992; and (3) on July 4, 1992, Mr. Luvene handed approximately $700 to a woman he met in a bar and asked her to count it.

Mr. Luvene's possession of unusual amounts of money around the time of the robbery of the Milton liquor store is relevant in that it has some tendency to make it more probable that Mr. Luvene committed the robbery than would be the case without this evidence. *See* ER 401, 402. While the admission of such evidence involves a danger of creating an inference that poor individuals are more likely to commit robbery than wealthy individuals, *State v. Matthews*, 75 Wn. App. 278, 285-86, 877 P.2d 252 (1994), *review denied*, 125 Wn.2d 1022 (1995), this danger is addressed by the balancing of the probative value of the evidence against the potential for unfair prejudice against the defendant as mandated by ER 403. The trial court in this case engaged in the proper analysis and concluded that the evidence was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice. Report of Proceedings, vol. 12, at 1639-42, 1675-81; Report of Proceedings, vol. 13, at 1777. We cannot conclude that the trial court abused its discretion in admitting this evidence.

## REFUSAL TO ALLOW CERTAIN EVIDENCE

Mr. Luvene argues that the trial court erred in refusing to permit surrebuttal testimony on the color of the gun allegedly taken from Luvene's apartment by D'Tisha Pickett's boyfriend. The defense apparently wished to show that the gun allegedly taken was black, the same color as the gun used in the robbery.

We review the refusal by a trial court to admit surrebuttal evidence under a manifest abuse of discretion

standard. *State v. White*, 74 Wn.2d 386, 395, 444 P.2d 661 (1968). "Testimony which is merely cumulative or confirmatory or which is merely a contradiction by a party who has already so testified does not justify surrebuttal as of right." *State v. Dupont*, 14 Wn. App. 22, 24, 538 P.2d 823 (1978) (citing *State v. Stambach*, 76 Wn.2d 298, 301, 456 P.2d 362 (1969)).

During the defense case in chief, Lisa Bell testified about the color of the gun that was allegedly taken from Mr. Luvene's apartment.

> Defense: You've described a gun as being silver in color. Do you know, in fact, what color this was? Can you describe it for the jury?
>
> Ms. Bell: Like this, but darker.
>
> Defense: Would gray be an accurate description?
>
> Ms. Bell: Not really. Dark. Just dark.

Report of Proceedings, vol. 22, at 2934. On cross-examination, she stated, "I was thinking silver," and specifically declared that the gun was not black. Report of Proceedings, vol. 22, at 2935.

As the trial court noted, there was ample opportunity during the direct examination of Ms. Bell in the defense case to elicit testimony on the color of the gun. Report of Proceedings, vol. 24, at 3130-31. Any surrebuttal testimony by Ms. Bell only would have confirmed or contradicted her earlier testimony. The trial court, therefore, did not abuse its discretion in disallowing this surrebuttal testimony.

During the trial, the defense attempted to make a record of an alleged attempt by the prosecutor to intimidate defense witness Lisa Bell following her testimony on the alleged theft of a gun from Mr. Luvene's apartment. The trial judge heard from Ms. Bell outside the presence of the jury. She stated that the prosecutor accused her of lying during her testimony and implied that she would go to jail if she had lied. Ms. Bell's mother had apparently overheard this conversation and the defense wanted the trial

court to hear testimony from her. The trial judge refused, noting that he had heard testimony from the person who was the focus of the discussion, that the events occurred outside the presence of the jury, and that it is not relevant for the purpose of determining the guilt or innocence of Mr. Luvene. Report of Proceedings, vol. 24, at 3151-52. Mr. Luvene has cited no authority suggesting that the trial court abused its discretion by refusing to hear testimony from Ms. Bell's mother, and we can find no error.

■ Mr. Luvene also argues that the trial court erred in refusing to allow the admission into evidence of his identification card photograph. The defense first attempted to introduce Mr. Luvene's Washington State Identification Card into evidence after the testimony was completed and both sides had rested. The identification card would have shown that Mr. Luvene is five feet six inches in height, shorter than one of the witnesses identified the assailant as being. The defense counsel claimed that he had intended to introduce this evidence during the trial, but it had slipped his mind. The defense requested that the information on the identification card be presented to the jury, either through a stipulation or by reopening the case. The trial court refused the defense request, noting that the jury had ample opportunity to view Mr. Luvene in both a sitting and a standing position throughout the trial, and that there had been other evidence of his height presented to the jury. Report of Proceedings, vol. 24, at 3154. "A motion to reopen a proceeding for the purpose of introducing additional evidence is addressed to the sound discretion of the trial court." *State v. Sanchez*, 60 Wn. App. 687, 696, 806 P.2d 782 (1991). The trial court did not abuse this discretion in refusing to reopen the case in order to admit into evidence Mr. Luvene's identification card.

■ During trial, the defense sought to ask police officers about the existence of other suspects. The trial court refused to permit this inquiry. Report of Proceedings, vol.

22, at 2969. The defense has the burden of presenting a proper foundation before any such inquiry is permitted. "Before such testimony can be received, there must be such proof of connection with the crime, such a train of facts or circumstances as tend clearly to point out someone besides the accused as the guilty party." *State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932), *quoted in State v. Mak*, 105 Wn.2d 692, 716, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986). No such foundation was provided in this case. The trial court, therefore, did not err in refusing to allow such questioning.

### SUFFICIENCY OF THE EVIDENCE

 Finally, Mr. Luvene argues that the evidence was insufficient to support his conviction; and even if it could support the robbery conviction, it was insufficient to establish the element of premeditation. In considering such a claim, an appellate court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), *quoted in State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

In the present case, the surviving victim and a number of customers identified Mr. Luvene as the assailant. A live cartridge that had been cycled through the murder weapon was recovered from Mr. Luvene's apartment. The liquor found in Mr. Luvene's apartment was the same type stolen from the Milton liquor store and had lot numbers that matched the inventory of that store. Mr. Luvene displayed an unusual amount of wealth for him in the days following the robbery. On the day of the robbery, Mr. Luvene had access to a black GEO Storm which matched the description of a vehicle seen at the crime scene. Taken in the light most favorable to the prosecution, this evidence is sufficient for a rational trier of fact to convict Mr. Luvene of the crimes charged.

Similarly, the evidence was sufficient for a rational jury to find premeditation. According to the testimony, the assailant entered the liquor store, placed an order, and waited for other customers to leave. Then, while Ms. Detrick was filling his order, the assailant, without a word, raised his gun and shot Mr. Bond twice. He then turned and shot Ms. Detrick twice. The assailant thereafter proceeded to rob the store. The jury could reasonably infer from this evidence that the assailant intended to kill the store clerks before committing the robbery.[2]

NOTICE OF INTENT TO SEEK THE DEATH PENALTY

RCW 10.95.040 provides, in part:

(1) If a person is charged with aggravated first degree murder as defined by RCW 10.95.020, the prosecuting attorney shall file written notice of a special sentencing proceeding to determine whether or not the death penalty should be imposed when there is reason to believe that there are not sufficient mitigating circumstances to merit leniency.

(2) The notice of special sentencing proceeding shall be filed and served on the defendant or the defendant's attorney *within thirty days after the defendant's arraignment* upon the charge of aggravated first degree murder *unless the court, for good cause shown, extends or reopens the period for filing and service of the notice. . . .*

(3) *If a notice of special sentencing proceeding is not filed and served as provided in this section, the prosecuting attorney may not request the death penalty.*

(Italics ours.)

Mr. Luvene was arraigned on July 14, 1992. At that time, it was calculated that the State had until August 13, 1992, to file notice of intent to seek the death penalty in order to be within the statutory period of thirty days. At

---

[2]The element of premeditation was not a contested issue at trial. The defense proceeded on a theory of mistaken identity and conceded that whoever did rob the Milton liquor store probably committed premeditated murder. *See* Report of Proceedings, vol. 24, at 3244.

the arraignment, and again at the pretrial conference three days later on July 17, 1992, the defense counsel indicated that they would be amenable to an extension of the thirty-day period. However, at the arraignment, the defense counsel also indicated that any waiver would be written and would be signed by Mr. Luvene. Again, at the pretrial conference, the defense counsel indicated that a waiver would be written and signed by Mr. Luvene. Additionally, at that conference, the assigned judge, Judge Tollefson, stated: "If somebody is going to ask me to sign an order extending the time in which the prosecutor is required to give notice . . . they should do so before the end of this month, before the last Friday of the month." The defense counsel responded, "we can come down and put it on the record if you wish, but we will do it before the end of the month." There is no indication that the statements of defense counsel misled the State about its obligations.

The record indicates that the prosecutor was on a two-week vacation during the last two weeks of July 1992, but was back well before the August 13 deadline.[3] During oral argument before this court, Mr. Johnson, the prosecutor in Mr. Luvene's trial, claimed that upon returning to the office, he thought the matter had been taken care of, and only discovered on August 12 that the order to extend the period had not been filed. Despite this failure of communication in the Pierce County Prosecutor's office, Mr. Johnson still had August 12 and 13 to file the order, but failed to do so. The State noted that Judge Tollefson was out of town on August 12 and 13, but acknowledged that the prosecutor could have presented the order to another judge in Pierce County on either of those last two days of the statutory period.

According to the State, the prosecutor and the defense counsel signed an order to extend the time period on

---

[3]It is obvious that a personal vacation cannot be a valid excuse for the failure to file the notice.

August 12, 1992.[4] However, by the State's own admission, while the prosecutor had the opportunity to present the order to a judge before the statutory period expired, he failed to do so until August 17. Judge Aubrey, who had not previously been connected with the case, signed the order on August 17 extending the deadline, which had passed four days earlier, to October 23, 1992.[5] The order states that the matter came before the court "upon the stipulation of the Prosecuting Attorney and the defendant." Clerk's Papers at 45. Mr. Luvene denies that he agreed to any such order. Judge Aubrey signed the order "nunc pro tunc August 12, 1992." Clerk's Papers at 45. However, there is nothing in the record to indicate, and the State does not claim, that the parties appeared in court or that a hearing to extend the date of filing was held on August 12.

Subsequently, the parties appeared before Judge Tollefson on October 1, 1992, for the omnibus hearing. Apparently assuming that the nunc pro tunc order was valid, the prosecutor stated that the State had until October 23 to file the notice of intent to seek the death penalty. The defense did not object and discussed with the prosecutor the problems with gathering the mitigation evidence. On October 21, the parties filed a second order extending the time limit, this time until November 30, 1992. On November 23, 1992, another order extending the time was filed, setting a new deadline of January 22, 1993. On January 22, 1993, the State filed its notice to seek the death penalty.

Mr. Luvene now argues that the nunc pro tunc order signed by Judge Aubrey on August 17, 1992, was void on its face and did not extend the statutory deadline for filing the notice of intent to seek the death penalty.

A nunc pro tunc order is appropriate only to

---

[4]Mr. Luvene did not sign the order, nor was he present when the order was signed.

[5]The order was dated August 17, but was filed on August 18.

record some act of the court done at an earlier time but which was not made part of the record. *State v. Smissaert*, 103 Wn.2d 636, 640, 694 P.2d 654 (1985). It cannot be used to remedy the failure to take an action at that earlier time. *State v. Mehlhorn*, 195 Wash. 690, 692-93, 82 P. 158 (1938). There was no judicial action taken on August 12. The order signed "nunc pro tunc August 12, 1992," therefore, cannot be a valid extension of the statutory period.

The State suggests, however, that because the statute gives the court the authority to extend or reopen the statutory period for the State to file the notice if "good cause" is shown, RCW 10.95.040(2), even if the nunc pro tunc order cannot be a valid exercise of the judge's authority to *extend* the deadline as of August 12, 1992, it could be seen as a valid exercise of his authority to *reopen* the statutory period as of August 17, 1992. One problem with this argument is that the order did not purport to "reopen" the statutory period. Instead, it twice specifically stated that it was "extend[ing]" the deadline. Clerk's Papers at 45.

Even if we were to accept such an interpretation of this order, there must still be a showing of "good cause" to reopen the statutory period. Such a showing is impossible in this case.

First, the order states that the "good cause" is based upon a stipulation between the prosecuting attorney and the Defendant. The record, however, does not contain any evidence of a written stipulation agreed to by the Defendant. The earlier oral comments by defense counsel in the presence of the Defendant could possibly be interpreted as a stipulation to *extend* the period if the statutory procedures had been followed and Mr. Luvene's signature had been obtained,[6] but not as a stipulation to *reopen* the period after it had expired. The result of any stipulation to

---

[6]Given that Judge Tollefson told the parties that any request to extend the statutory period should be presented to him by the end of the month, and the defense counsel indicated that he would do so by the end of the month, and given that the defense also indicated that any such request would be in writing and signed by Mr. Luvene, when the end of the month came and went with no

reopen the period after it had expired would have been to reexpose Mr. Luvene to the death penalty at a time when the State was precluded by the statute from seeking it. If the defense counsel had stipulated to reopening the period, such an action would constitute reversible error resulting from ineffective assistance of counsel.

Any stipulation to the *extension* of the time period that may have been made before August 13, 1992, cannot carry over past the expiration of the statutory period on that date and be treated as an entirely different matter, a stipulation to *reopen* the period. For this reason, a finding of good cause cannot be based upon the stipulation in this case. To find good cause, therefore, would require us to ignore what is explicitly stated in the order and to attribute to the judge a different reason for granting the order than the one he actually stated. Even if such a judicial fiction were employed, the record provides us with no other reasons for good cause to reopen the statutory period.

The issue of good cause in the context of RCW 10.95.040(2) has recently been addressed. In *State v. Dearbone*, 125 Wn.2d 173, 883 P.2d 303 (1994), the deputy prosecutor, before the expiration of the statutory period, notified defense counsel by voice mail and in person of the State's intention to seek the death penalty and filed the notice with the trial court. The prosecutor failed to serve a copy of the written notice on the defense counsel before the time limit had expired. On the State's motion, the trial court reopened the statutory period to allow the State to serve defense counsel, finding good cause based upon the prosecutor's efforts to accommodate the defense. The trial court found these efforts were a partial cause of the failure to serve notice, the defendant had actual notice of

written request for an extension from the Defendant and no order from the judge, the prosecutor should have been alerted to the possibility that any earlier indications by the Defendant that he would be amenable to such an extension were no longer valid. Thus, absent the fulfillment of these agreed-upon procedures, these comments by the defense counsel cannot be seen even as a stipulation to extend the statutory period, much less as a stipulation to reopen the period.

the State's intent, and the defendant suffered no prejudice as a result of the delay. *Dearbone*, 125 Wn.2d at 178.

■■■■■ We noted that we review a trial court's determination of good cause to extend or reopen the statutory period de novo. We then went on to hold that in order for there to be good cause for the extension or reopening of the thirty-day statutory period for filing and serving the notice of intent to seek the death penalty, there must be

> a reason *external* to the prosecutor for his failure to serve notice. Without this external reason, Defendant's actual notice of the State's intent and the corresponding lack of prejudice to Defendant's case is irrelevant.

*Dearbone*, 125 Wn.2d at 179. A self-created hardship was specifically rejected.[7] Moreover, we held that the doctrine of substantial compliance does not apply in this context. "Substantial compliance is neither proof of good cause under RCW 10.95.040(2), nor is it an exception to the time limit established by the statute." *Dearbone*, 125 Wn.2d at 182.

Given the facts of this case, we conclude that there was no valid external impediment to the prosecutor's filing of the order before the deadline originally passed on August 13, 1992. The State admitted at oral argument that it had the order prepared on August 12 and that there was nothing to prevent it from presenting it to a judge on the 12th or 13th. There was no reason, other than the State's inadvertence, that the notice was not filed nor an extension sought within the statutory period. Such carelessness obviously cannot constitute "good cause" to reopen the period for filing notice. "An attorney's inadvertence alone is not good cause." *Dearbone*, 125 Wn.2d at 180.

---

[7]We noted that an external reason is required in order to show good cause in other contexts. For example, in interpreting "good cause" in the context of the speedy trial rule, this court stated that "[s]elf-created hardship is not an excuse for violating mandatory rules." *State v. Mack*, 89 Wn.2d 788, 794, 576 P.2d 44 (1978). We also noted with approval a Court of Appeals decision that in the context of the involuntary commitment statute, RCW 71.05.240, good cause "required an unavoidable and unusual delay which was outside the State's control." *Dearbone*, 125 Wn.2d at 181 (citing *In re Kirby*, 65 Wn. App. 862, 868-69, 829 P.2d 1139 (1992)).

In sum, the requirements of RCW 10.95.040 are quite simple. If the State wishes to seek the death penalty in a particular case, it must file a notice of intent within thirty days of arraignment, unless there is good cause shown to extend or reopen the statutory period. It is not unduly burdensome to ask the State to follow these simple procedures, especially when they are so flexible and designed to give the State every reasonable opportunity to file notice. Because the State failed to file the prepared order extending the statutory period through simple inadvertence, there was no such good cause as is required by *Dearbone* in this case.[8]

 We hold that, absent a showing of good cause, the prosecutor's failure to file the notice of intent to seek the death penalty within the thirty-day period, as is required by RCW 10.95.040(2), precludes the State from seeking the death penalty. Mere inadvertence on the part of the prosecutor does not constitute good cause. Mr. Luvene's death sentence must be overturned and his case remanded so that he may be resentenced to life imprisonment without the possibility of release or parole. To hold otherwise would be to overrule our recent unanimous decision in *State v. Dearbone, supra.*

Our disposition of this case does not require us to address the other claimed errors in the penalty phase raised by Mr. Luvene.

### Conclusion

Mr. Luvene's convictions of aggravated first degree murder, attempted first degree murder, and first degree robbery while armed with a deadly weapon are affirmed. The

---

[8] As the United States Supreme Court has repeatedly noted, "the penalty of death is qualitatively different from a sentence of imprisonment, however long." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). Because of this difference, we should strive to ensure that the procedures and safeguards enacted by the Legislature are properly followed by the State. The determination of whether a defendant will live or die must be made in a particularly careful and reliable manner and in accordance with the procedures established by the Legislature.

sentence of death is vacated and the case is remanded to the trial court for the imposition of a sentence of life imprisonment without possibility of release or parole in accordance with RCW 10.95.030(1).

SMITH, GUY, JOHNSON, MADSEN, and TALMADGE, JJ., concur.

DURHAM, C.J. (dissenting) — While I agree with the majority's resolution of issues relating to the Defendant's guilt phase, I cannot agree with its interpretation of the statute governing notice of intent to seek the death penalty. The majority misunderstands both the statute and our recent decision construing the statute. Accordingly, I respectfully dissent.

The State must file written notice of intent to seek the death penalty within thirty days of arraignment for aggravated murder, "unless the court, for good cause shown, extends *or reopens* the period for filing and service of the notice." RCW 10.95.040(2) (emphasis added). The language makes clear the thirty-day period is not an absolute or rigid limit, provided there is good cause. Moreover, the statute explicitly provides for reopening the period *even if it has already passed.*

We recently construed what constitutes "good cause" to extend or reopen the notice period. *State v. Dearbone*, 125 Wn.2d 173, 883 P.2d 303 (1994). In *Dearbone* we said that good cause involves something more than "inadvertence alone." *Dearbone*, 125 Wn.2d at 180. Good cause requires "a reason *external* to the prosecutor for his failure to serve notice." *Dearbone*, 125 Wn.2d at 179. In other words, "[t]o show good cause, the State must first provide an external factor" for its failure to provide timely notice. *Dearbone*, 125 Wn.2d at 181. In addition, we suggested that a defendant's "induc[ing] the prosecutor not to serve the notice"

might constitute good cause to reopen the period. *Dearbone*, 125 Wn.2d at 183. In the present case, there was both a reason external to the prosecutor for the failure to serve timely notice and inducement on the part of the Defendant.

EXTERNAL REASON

The majority makes two crucial admissions. It admits that defense counsel and the prosecutor signed a proposed order to extend the time period on August 12, 1992 — *two days before the thirty-day period elapsed.*[9] Majority at 714-15. The majority also admits the judge assigned to the case was out of town on August 12 and 13 and, therefore, unavailable to sign the extension order. Majority at 714. Surely the absence of the judge on the last two days of the filing period amounts to "a reason external to the prosecutor" under *Dearbone.*

It is true the State did not do everything humanly possible to have the agreement signed by a judge within the initial thirty-day period. As the majority points out, the State could have presented the order to another judge in Pierce County. However, "doing everything humanly possible" is not the standard for good cause. *Dearbone* required only "a reason *external* to the prosecutor for his failure to serve notice." *Dearbone*, 125 Wn.2d at 179. The absence of the judge in the last two days of the filing period is a significant "external factor" relating to the

---

[9]The majority appears to admit the proposed order was timely signed by defense counsel and the prosecutor, but also states that Luvene "denies that he agreed to any such order." Majority at 715. It is unclear whether this means Luvene denies he personally agreed to the order, or whether his present counsel contends Luvene's counsel at the time did not sign the proposed order. As I will argue *infra*, whether Luvene personally agreed to the extension is irrelevant under the statute, provided good cause to extend or reopen the period existed.

The majority's admissions are based on information provided at oral argument by the State. To the extent factual ambiguities exist, the majority's resolution of the notice issue without supplementing the record is inappropriate.

State's failure to provide timely notice.[10] *Dearbone*, 125 Wn.2d at 181. That is all that is required by *Dearbone* for good cause to exist.

INDUCEMENT

There is also ample evidence that the Defendant induced the State not to timely file. The State did not attempt to file until the last two days of the period — when the judge turned out to be unavailable — because the Defendant had repeatedly indicated he wanted to extend the period. Luvene's counsel, on the record, requested additional time beyond the initial thirty-day period in order to gather mitigating evidence.

> [DEFENSE COUNSEL]: We've received a copy of notice of the consideration for the special sentencing procedure. I've explained to Mr. Luvene what this entails and the evidence that's involved on our part as far as presenting a [m]itigation package to the prosecutor in order to hopefully head them off on this motion. He is ameanable [sic] to allowing the Court to extend the August 13th date, which *I'm putting it on the record now*, but we would submit a written order through [the prosecutor] and have it signed by our client at the time.

Report of Proceedings, 7/14/92, at 7 (emphasis added). Luvene's counsel not only requested an extension of time at the arraignment hearing on July 14, 1992, but continued to ask for the extension, including at the pretrial conference on July 17, 1992. In all, three distinct extensions were eventually ordered "for good cause shown." Given Luvene's repeated requests for additional time, the state did not fail to file through "inadvertence alone," *Dearbone*, 125 Wn.2d at 180, but as a result of the assurance by the Defendant that he wished to extend the period. Indeed, until the nunc pro tunc ambiguity was discovered on ap-

---

[10]Especially in death penalty cases, it is good practice for the assignment judge to retain exclusive control of all proceedings to the extent possible. As a matter of policy, requiring "another judge in Pierce County" to step in, majority at 714, seems both unnecessary and unwise. It is precisely to meet exigencies such as occurred in this case that good cause exceptions exist.

peal, the Defendant thought he had successfully extended the period.

The mutual agreement to extend the period here stands in stark contrast to *Dearbone*. In *Dearbone*, all negotiations regarding extension were terminated the day before the end of the period, with the prosecutor refusing to extend the deadline a second time. *Dearbone*, 125 Wn.2d at 183. In contrast to *Dearbone*, here evidence "in the record suggests defense counsel induced the prosecutor not to serve the notice," *Dearbone*, 125 Wn.2d at 183, with the inducement including a verbal agreement on the record. Had the Defendant reneged on the agreement sometime prior to the last two days of the thirty-day period, the State would simply have filed its notice. Instead, the State reasonably believed the Defendant's assurances that a written request to extend would be forthcoming at some point prior to the expiration of the thirty-day period.

The majority contends that the judge, the Defendant, and the State anticipated formalizing the agreement to extend the period in writing. While this may be true, the statute requires no such formalization as a condition for either extending or reopening the period. Whether Luvene signed a statement agreeing to the extension, whether there was a written stipulation to extend, whether the judge wanted the matter taken care of by the end of July, are all irrelevant under the statute. The majority seems to think of the discussion of formalizing the extension request as creating a kind of contract to enter into a written stipulation and present it to the judge by the end of July. Majority at 716. We are not interpreting a contract; we are asking only whether good cause existed to reopen the period.

Even if one grants the majority's contention that the parties anticipated a formalized agreement to extend, it only makes the argument for inducement more persuasive. That very anticipation created an obvious inducement to wait until the end of the period. The State did not file notice of intent to seek the death penalty earlier in the

thirty-day period for a very good reason. It relied on the Defendant's assurances that he would submit a request for extension in writing, prior to the expiration of the period. If anything, the Defendant's assurances that he would request the extension in writing induced the State to put off filing notice until either (a) it received the Defendant's written request to extend the period, or (b) it neared the end of the thirty-day period.

### NUNC PRO TUNC

Luvene was arraigned on July 14, 1992 and, therefore, the deadline for filing notice of intent to seek the death penalty was initially August 13, 1992. An order was entered extending the period to October 23, 1992. The order reads:

> This matter having come on before the above entitled court upon the stipulation of the Prosecuting Attorney and the defendant, and it appearing that good cause exists to extend the filing period, now, therefore,
>
> IT IS HEREBY ORDERED:
>
> That the period for filing and service of the Notice to Seek Death Penalty as provided in RCW 10.95.040 is extended to the date of October 23, 1992.
>
> DONE IN OPEN COURT this 17 day of August, 1992. Nunc Pro Tunc August 12, 1992

Clerk's Papers at 45. Although Luvene contends the record lacks external evidence that the order was in fact signed in open court, the statute does not require that extending or reopening the period be ordered in open court.

The order was signed August 17 and filed August 18, but was dated "Nunc Pro Tunc August 12, 1992." The period was later extended to November 30 at the written *request of Luvene's assigned counsel.* The period was extended a third time, to January 22, 1993, based on a stipulation of the prosecutor and the Defendant. Until

this appeal, there was no question that both Luvene and the State had an interest in extending the period past the initial thirty days. There was no question that both agreed, repeatedly, to extend the period. It was only after trial, when the nunc pro tunc language became an issue, that any ambiguity arose.

I agree with the majority that signing the order nunc pro tunc was insufficient to *extend* the period. "The purpose of a nunc pro tunc order is to record some prior act of the court which was *actually performed* but not entered into the record at that time." *State v. Rosenbaum*, 56 Wn. App. 407, 410, 784 P.2d 166 (1989) (citing *State v. Melhorn*, 195 Wash. 690, 692, 82 P.2d 158 (1938)). However, that makes no difference in light of the statute's provision for *reopening* the period, since reopening by definition occurs only once the thirty-day period has elapsed.

The majority believes the trial court's use of the word "extend" rather than "reopen" in its initial August 17th order somehow settles the issue. Majority at 716. However, since the trial court had the power to reopen the period once the thirty days had passed, the only relevant issue is whether good cause existed to reopen the period. Moreover, this court reviews the existence of good cause in this context de novo. *Dearbone*, 125 Wn.2d at 178. We are not bound by the trial court's choice of "extend" rather than "reopen," since we review the existence of good cause independently of the trial court.

The majority notes Luvene neither signed the order nor was present when it was signed. Majority at 715 n.4. The Defendant's agreement to extend the period, of course, is not needed. Contrary to what the majority implies, extending or reopening the period in no way hinges on the Defendant's consent. *See* RCW 10.95.040. Given good cause, a trial court can extend or reopen the period regardless of the Defendant's wishes. As we recently noted in a similar context, "[t]he court is part of the proceeding and is not a potted-palm functionary, with only the attorneys

726

having a defined purpose." *State v. Ford*, 125 Wn.2d 919, 924-25, 891 P.2d 712 (1995).

### Conclusion

The majority transforms an ordinary requirement of "good cause shown" into a requirement that the State use all possible means to timely serve the Defendant, even when the Defendant has agreed to extend the period, and when the judge assigned to the case is out of town for the final two days of the period. That was not our holding in *Dearbone*, and it does not conform with common sense. I would hold good cause existed to reopen the period.

DOLLIVER and ALEXANDER, JJ., concur with DURHAM, C.J.