IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80692-1-I |
| | ) | (consolidated with No. |
| Respondent, | ) | 81660-8-I) |
| | ) | |
| v. | ) | DIVISION ONE |
| | ) | |
| JERRY GEORGE WOOD, JR., | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Jerry Wood, Jr. appeals his convictions and sentence for solicitation of first degree murder and solicitation of first degree kidnapping. We affirm the convictions, concluding that Wood was not denied his Sixth Amendment right to effective assistance of counsel when his attorney turned over inculpatory evidence to the State. We reverse Wood's sentence and remand to the trial court to determine whether Wood's out-of-state convictions are comparable to Washington crimes and properly included in his offender score.

## FACTS

On January 14, 2017, K.M. met Wood and his friend, Abdulaziz Mohamed, in a Shoreline bar. K.M. testified she left the bar with them when they offered to drive her home. Mohamed, however, testified that K.M. agreed to travel to Arlington with the men to visit Wood's friend, Rick Walton.

K.M. testified that when she got into the front passenger seat of Wood's car, Mohamed was in the driver's seat and Wood was in the back. She turned to thank Wood for giving her a ride home and he punched her in the face. According to K.M., Wood then pulled her into the back seat, grabbed her by the hair, and forced her to perform oral sex on him.

Mohamed described these events differently. He testified that Wood was initially in the driver's seat and there was no physical altercation between Wood and K.M. as they drove to a gas station in Everett. En route, Mohamed switched seats with Wood and took over driving. K.M. moved to the back seat with Wood when Mohamed got into the driver's seat. Mohamed described Wood as "drunk and excited" because he thought he was "going to do something sexual with this girl tonight." When they stopped at the gas station, Wood became agitated and Mohamed described Wood's mood as having "changed."

Wood instructed Mohamed to head to Walton's house. As Mohamed drove north on I-5, he realized Wood was very mad. He heard Wood begin to argue with K.M. and could feel the car shaking. When he looked back to see what was happening, he saw Wood placed K.M. in a headlock. Mohamed attempted to grab Wood's arm to stop him from assaulting K.M., but was unsuccessful. When Mohamed tried a second time to separate Wood and K.M., Wood showed him a gun. Mohamed became frightened for both himself and K.M. K.M. appeared scared and began screaming. Mohamed did not feel he could stop in the middle of the road and leave K.M. with Wood, so he decided to "punch the gas" and get

to Walton's house "to get [K.M.] to some safe place." Mohamed called Walton before arriving to tell him they were on their way.

Once they arrived at Walton's house, Mohamed got out of the car in a panic and went to find Walton. Mohamed told Walton that Wood was in the car getting violent with K.M. and asked him to intervene. Together, they planned a way to get K.M. to safety and to get Wood off the property.

According to K.M., after Mohamed got out of the car, Wood ripped off her pants and underwear and forced her to have vaginal sex with him. Wood disputed K.M.'s version of events. He testified that they engaged in consensual intercourse and after they finished, K.M. asked Wood to take her home. When he refused, she hit him in the face. Wood admitted he became angry at K.M. and hit her in the face.

When Mohamed returned to the car, he found K.M. sobbing and naked from the waist down, with blood on her chest and marks on her face. Walton's girlfriend, Tara Lien, helped Mohamed get K.M. out of the car and into the house. K.M. realized at that point that she was not wearing any underwear or pants. Mohamed reached into the car to grab K.M.'s pants and purse and helped K.M. get dressed. He described her as "in distress . . . , very confused, and shaking, [and] it was hard for her to stand straight." Wood remained in the backseat of his car.

K.M. recalled entering Walton's house, lying down on a couch, and seeing blood on her jacket and clumps of her hair on her clothes. K.M. insisted she did not want to call 911, and Lien used K.M.'s cellphone to call Amber Simpson and Jay Gaudina, K.M.'s friends, to ask them to come and take K.M. home.

Walton wanted Wood off his property. Once he knew K.M. was safely inside the house, Walton convinced Wood to accompany him and Mohamed to a nearby casino. Walton and Mohamed left in Walton's car and Walton's friend drove Wood's car because Wood had, by this time, passed out in the back seat.

Simpson and Gaudina picked K.M. up from Walton's house and drove her to a friend's nearby home. They later took her to the hospital because of the severity of K.M.'s injuries. K.M. had visible bruises under her nose, on her right eyelid, and around her mouth. Her lip was swollen and bleeding. At the hospital, the forensic nurse who examined K.M. noted bruising and redness over her right cheek and eyelid, blood in her right eye, and a disruption to the skin of her vagina. Semen samples collected from K.M.'s vagina and from the back of the car were consistent with Wood's DNA.

When the police subsequently executed a search warrant at Wood's home, they discovered the underwear K.M. had been wearing that night and her credit card in Wood's bedroom. They also found K.M.'s hair in the back seat of his car. On February 3, 2017, the State charged Wood with a single count of second degree rape by forcible compulsion under RCW 9A.44.050(1)(a).

In January 2018, while in the Snohomish County Jail awaiting trial, Wood was confined in a maximum security unit known as "the hole" at the same time as Anthony Baldonado, a man Wood had met in jail in 2017. Baldonado, who was trying to raise money for bail, testified that Wood promised to help him with bail money if Baldonado would help Wood with something. Wood asked Baldonado

- 4 -

how much he needed and told him he would have the money dropped off with a bail bond company.

Later, Wood left the unit for a visit and when he returned, he told Baldonado that the money had been dropped off. Baldonado asked Wood if he had anything to read. Wood said he would give a book to a corrections officer to pass to Baldonado. A few hours later, while he was reading the book, Wood instructed Baldonado to flip to specific pages to receive a message from Wood. Baldonado followed Wood's directions and found "little sentences" handwritten in between the paragraphs of the book. Later that same day or the next day, Baldonado received a second book from Wood containing additional messages.

Wood's notes included descriptions of K.M., her house and address, and instructions to "make her disappear by any means." Wood stressed how important it was for K.M. to "disappear before the 5th" (Wood's trial date), and that Wood was relying on Baldonado. He told Baldonado to "babysit [her] for 40 days" or administer a lethal dose of heroin. The notes informed Baldonado that K.M. lived with her father and told him that "if the dad say[s] she is not there go in the house anyway [be]cause he's lying." Wood promised rewards including the money Baldonado needed for bail "plus a car and 200 a day to babysit for 40 days." Wood assured Baldonado that "you wont [sic] have to worry about shit [be]cause I got you with whatever work, money, house anything." A handwriting expert confirmed that Wood had written these notes.

At the same time that Wood passed these notes to Baldonado, Wood's mother, Shirley Malone, paid $450 towards Baldonado's bail. When Baldonado

learned he was going to be released, he tore Wood's notes out of the books, intending to turn them over to his lawyer to get a deal on his pending charges. Jail staff, however, stopped Baldonado as he was leaving the jail and seized the notes. Baldonado later disclosed to law enforcement that Wood had asked him to kill or kidnap K.M. and explained how Wood had instructed him on how to read his handwritten notes on the pages Baldonado had removed from the two paperback books. The jail found one of the two books Wood had delivered to Baldonado and verified that the torn pages Baldonado had in his possession came from the book. Baldonado subsequently entered into a plea agreement on unrelated gun charges in which he agreed to testify against Wood.

Based on Wood's notes and Baldonado's statement to the police, the State amended the charges against Wood to include one count of criminal solicitation of first degree murder under RCW 9A.28.030(1) and RCW 9A.32.030(1)(a) and one count of solicitation of first degree kidnapping under RCW 9A.28.030(1) and RCW 9A.40.020.

After entering his guilty plea, Baldonado was incarcerated in the Washington Corrections Center (WCC) in Shelton. Wood's friend and fellow gang member, Andrew Tisdale, was incarcerated at the WCC at the same time. Wood sent a letter to Tisdale identifying Baldonado as a snitch in his case. In February 2019, several WCC inmates told Baldonado that Tisdale knew he was a snitch and showed him paperwork from Wood's criminal case in which Baldonado was identified as a witness. Handwritten notes on the pleadings, subsequently determined to be Wood's handwriting, identified witness "A.B." as Baldonado and

called him a "rat." The inmates informed Baldonado that Tisdale wanted him to write an affidavit retracting any statement he had given police about Wood. They instructed him to say he had lied and "was only cooperating with the DA in order to get a deal out of [his] prison sentence." Although he initially refused, Baldonado came to believe that "they were going to try to jump" him if he refused. Tisdale wrote out what he wanted the affidavit to say and Baldonado copied it in his handwriting. Baldonado had his signature notarized in the law library and returned the affidavit to Tisdale.

Tisdale then spoke with Malone on a recorded jail phone call to tell her that he had obtained Baldonado's affidavit and, at her instruction, mailed the affidavit to Wood's defense counsel, Walter Peale. Peale provided a copy of the affidavit to the State. At the same time, Baldonado sent a letter to the prosecutor explaining what had occurred in the WCC. Baldonado also forwarded to the prosecutor the documents Tisdale had given him that identified him as a "rat."

Approximately six months later, the prosecutor asked Peale if he could see the original affidavit and the envelope in which it had arrived for purposes of handwriting analysis. When Peale retrieved the original documents, he noticed for the first time that there was a letter from Tisdale (the Tisdale Letter) addressed to Wood inside the envelope. The Tisdale Letter read:

K-Doe[1]

This should help you out with your legal troubles. If there's anything else I can do let me know. . . .I'm in here doing bad so if you can shoot a female my way or put a lil something on my media via JPay I would appreciate it. But I did this off the strength.

---

[1] "K-Doe" is Wood's street name. Baldonado knew Wood by this nickname.

Lil' Sleepy[2]

Peale did not give the Tisdale Letter to Wood, believing that it would be a violation of a court order prohibiting Wood from communicating with anyone other than his legal team. Peale did, however, provide a copy of the letter to the State. The State then amended the information against Wood to include a fourth charge for conspiracy to intimidate a witness under RCW 9A.28.040 and RCW 9A.72.110(1).

During pretrial motions, the topic of the Tisdale Letter arose in the context of a discussion about whether the State intended to introduce evidence that Wood had a gang affiliation. The State argued that evidence that Wood and Tisdale shared a gang affiliation was relevant to the conspiracy charge. The prosecutor stated:

> [T]his didn't come together entirely until just recently when Mr. Peale finally submitted the letter that he had received from Mr. Tisdale weeks before, and hadn't provided the first time I requested it – the first time he sent things. It was only after I noticed that the return address on the envelope in his first submission to me was missing that I inquired of it, suspecting that this letter had come from Mr. Tisdale. And then it was sent with this letter from Mr. Tisdale to Mr. Wood, which solidified the gang connection that was apparent before, but not nearly as clear.

The prosecutor said the State intended to call the lead investigator, Detective Betts, to testify about Wood's gang affiliation connecting him to Tisdale. Wood objected to having a detective testify about gang affiliations and sought to exclude this evidence. The trial court reserved ruling on the admissibility of any gang

---

[2] Tisdale went by the monikers of "Sleep" or "Sleepy."

affiliation between Wood and Tisdale to give Peale time to interview Detective Betts on this topic. Peale did not seek to exclude the Tisdale Letter or any testimony relating to it.

When the prosecutor referred to the Tisdale Letter in his opening statement, Wood moved for a mistrial. Peale argued that the prosecutor had suggested in his opening remarks that Wood had received the Tisdale Letter and the only way to refute this suggestion was for Peale to testify that he had intercepted the letter and Wood had never received it. The State argued that mistrial was unnecessary and offered to stipulate that Wood never received the letter.

The trial court denied the motion for mistrial. Peale then asked the court to appoint independent counsel to advise Wood on what he perceived as a conflict of interest. Although the trial court saw no actual conflict of interest, it agreed to appoint independent counsel to evaluate the issue with Wood.

Trial continued and, three days later, the court heard argument from the parties and Pete Mazzone, Wood's newly appointed conflict counsel. Mazzone contended there was a conflict of interest. He argued Peale violated the Rules of Professional Conduct (RPC) by disclosing evidence that implicated Wood and, by doing so, made himself a potential witness in the case, thereby hindering Wood from presenting a complete and proper defense. Wood, through Mazzone, indicated he did not wish to continue with Peale representing him on the solicitation and witness intimidation counts because "that would necessarily impede his ability to present a full and proper defense."

The trial court concluded that there was no conflict with regard to the rape or solicitation charges because the Tisdale Letter was immaterial to these crimes. The court then excluded all evidence regarding the Tisdale Letter in order to resolve any potential conflict with regard to the remaining conspiracy charge. The court denied Peale's request to withdraw and declined to appoint new counsel.

The jury convicted Wood of solicitation of first degree murder and solicitation of first degree kidnapping, but acquitted him of conspiracy to intimidate a witness. The jury did not reach a verdict on the charge of second degree rape. Wood subsequently pleaded guilty to a reduced charge of assault in the third degree rather than face retrial on the rape charge. Wood was sentenced to 273 months of confinement and 36 months of community custody on the solicitation convictions. Less than a month after the judgment and sentence was entered, Wood filed a motion for a new trial under CrR 7.5 and CrR 7.8, claiming he had newly discovered exculpatory evidence. The trial court denied his motion for a new trial.

Wood appeals his solicitation convictions and sentence.[3]

---

[3] Wood does not challenge his guilty plea to assault in the third degree.

## ANALYSIS

### 1. Counsel's Motion to Withdraw

Wood argues he was denied effective assistance of counsel when the trial court refused to allow Peale to withdraw based on an alleged conflict of interest. Because Peale had a duty to disclose the Tisdale Letter to the State, the trial court did not abuse its discretion in excluding the Tisdale Letter to eliminate any need to have Peale testify about it. We therefore reject Wood's argument he was denied effective assistance of counsel.

The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel. U.S. CONST. amend. VI; In re Pers. Restraint of Gomez, 180 Wn.2d 337, 348, 325 P.3d 142 (2014). This includes the right to an attorney who is free from any conflict of interest. State v. Dhaliwal, 150 Wn.2d 559, 566, 79 P.3d 432 (2003). To establish a constitutional violation based on a conflict of interest, a defendant must demonstrate both that his attorney had a conflict of interest and that the conflict adversely affected counsel's performance. Id. at 570; State v. Reeder, 181 Wn. App. 897, 909, 330 P.3d 786 (2014).

The trial court's decision on a withdrawal request is reviewed for abuse of discretion. Kingdom v. Jackson, 78 Wn. App. 154, 158, 896 P.2d 101 (1995). Whether a conflict exists, however, is a question of law we review de novo. State v. O'Neil, 198 Wn. App. 537, 542, 393 P.3d 1238 (2017). "If a conflict creates a legal duty to withdraw, denying withdrawal is an abuse of discretion." Id. at 543.

A. Actual Conflict of Interest

Wood argues that Peale's disclosure of the Tisdale Letter to the State created an actual conflict of interest because he violated RPC 1.6(a)[4] and RPC 1.8(b),[5] placing his professional interests ahead of the interests of his client. Wood maintains that Peale's representation was impacted by his personal interest because he faced potential disciplinary sanctions for turning the Tisdale Letter over to the State.

RPC 1.7(a)(2) provides in pertinent part that a conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer." Under this rule, an actual conflict would exist if Peale's personal interests in avoiding disciplinary sanctions materially limited his representation of Wood.

We conclude there was no actual conflict here because under well-established Washington Supreme Court case law, a defense attorney has a duty to disclose incriminating evidence he receives from a non-client. In State ex rel. Sowers v. Olwell, 64 Wn.2d 828, 833, 394 P.2d 681 (1964), attorney Olwell possessed a knife that the State suspected Olwell's client had used to stab and kill a man. Id. at 830. During an inquest, the coroner sent Olwell a subpoena requiring

---

[4] Under RPC 1.6(a), a lawyer "shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph [1.6](b)." This rule covers both information falling within the attorney-client privilege as well as "secrets" the disclosure of which would be detrimental to a client. State v. Rogers, 3 Wn. App. 2d 1, 8, 414 P.3d 1143 (2018) (citing RPC 1.6 cmt. 21); Dietz v. Doe, 131 Wn.2d 835, 842 n.3, 935 P.2d 611 (1997) (RPC 1.6 is considerably broader than attorney-client privilege).

[5] RPC 1.8(b) provides that "[a] lawyer shall not use information relating to the representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules."

him to produce any knives relating to his client. Olwell refused to respond and was held in contempt and ordered to spend two days in jail. Id. at 830-31.

On appeal of the order of contempt, the Supreme Court concluded that the subpoena was invalid on its face because it required Olwell to disclose information provided to him by his client. Id. at 833. The court went on to state:

> We do not, however, by so holding, mean to imply that evidence can be permanently withheld by the attorney under the claim of the attorney-client privilege. Here, we must consider the balancing process between the attorney-client privilege and the public interest in criminal investigation. We are in agreement that the attorney-client privilege is applicable to the knife held by appellant, but do not agree that the privilege warrants the attorney, as an officer of the court, from withholding it after being properly requested to produce the same. The attorney should not be a depository for criminal evidence (such as a knife, other weapons, stolen property, etc.), which in itself has little, if any, material value for the purposes of aiding counsel in the preparation of the defense of his client's case. Such evidence given the attorney during legal consultation for information purposes and used by the attorney in preparing the defense of his client's case, whether or not the case ever goes to trial, could clearly be withheld for a reasonable period of time. It follows that the attorney, after a reasonable period, should, as an officer of the court, on his own motion turn the same over to the prosecution.

Id. at 833–34 (emphasis added). Other states have followed the reasoning in Olwell. See Morrell v. State, 575 P.2d 1200, 1207 (Alaska 1978) (defense attorney who came into possession of his client's written kidnapping plan and disclosed it to the prosecution did not deprive client of right to effective assistance of counsel because "a criminal defense attorney has an obligation to turn over to the prosecution physical evidence which comes into his possession, especially where the evidence comes into the attorney's possession through acts of a third party who is neither a client of the attorney nor an agent of a client."); Hitch v. Pima County Superior Court, 146 Ariz. 588, 594, 708 P.2d 72 (1985) (defense attorney

- 13 -

who received victim's watch from client's girlfriend had duty to turn watch over to law enforcement to prevent girlfriend from destroying it; duty of loyalty is subordinate to responsibility for proper administration of law).[6]

Under Olwell, Peale had a duty to disclose the Tisdale Letter to the prosecution and did not violate either RPC 1.6 or 1.8, or his duty of loyalty to Wood, by doing so. Peale knew the prosecutor suspected that Baldonado had been forced to sign the affidavit and that the State was investigating Tisdale for witness intimidation. He reasonably believed the letter was material evidence in that investigation. Given that the affidavit constituted a recantation of Baldonado's statement incriminating Wood in the solicitation charges, it was foreseeable that the Tisdale Letter might be material evidence on the credibility of Baldonado's recantation. Peale also realized that if he forwarded the Tisdale Letter to Wood, he would arguably be making Wood into a co-conspirator with Tisdale. By refusing to turn the letter over to Wood, Peale acted to advance his client's interests, not undermine them. And under the circumstances here, with Tisdale incarcerated and under suspicion for additional criminal activity, it was not a viable option for Peale to return the letter to Tisdale.

Finally, Peale turned the letter over only after the prosecutor made a specific request to obtain copies of the materials Peale had received from Tisdale. We

---

[6] The State argued that the disclosure was permitted under RPC 1.6(b)(6), which allows an attorney to "reveal information relating to the representation of a client to comply with a court order." The State contends the letter was documentary evidence, which Peale was required to produce under the omnibus order. But although the State asked the court to order the defendant to "[a]llow inspection of any physical or documentary evidence in possession of defendant or his/her attorney," as allowed under CrR 4.7(b)(2)(x), the omnibus order contained no language requiring Wood to disclose any documentary evidence. The record does not support the State's contention that Peale was complying with a court order when he disclosed the Tisdale Letter.

have found no authority, and Wood cites none, for the proposition that a criminal defense attorney owes a duty to a client to withhold incriminating evidence that comes into his possession from a third party when the prosecutor has requested to see it. Peale was obligated to disclose the Tisdale Letter to the prosecutor and doing so did not violate any of his ethical obligations to Wood. Because Peale's disclosure did not violate RPC 1.6 or 1.8, he faced no risk of professional discipline and his personal interest in avoiding such disciplinary sanctions would not have interfered with his representation at trial.

We recognize that when an attorney receives incriminating physical evidence and confronts the issue of whether to turn such evidence over to law enforcement, there is a tension between the duty of loyalty the attorney owes to his client and the duty of candor the attorney owes to the court. While there is a potential conflict between these duties, the possibility of a conflict is not enough to warrant reversal of a conviction. State v. Kitt, 9 Wn. App. 2d 235, 243, 442 P.3d 1280 (2019). Here, the duty of loyalty would not outweigh the duty to respond to the prosecutor's request with full candor, and thus, no actual conflict arose.

B. Deficiency in Representation

Even if Peale's disclosure of the Tisdale Letter created a conflict of interest, Wood must also show that the conflict either caused some deficiency in representation that affected Wood's interests, or likely affected specific aspects of Peale's advocacy on the Wood's behalf. State v. Regan, 143 Wn. App. 419, 427, 177 P.3d 783 (2008). The defendant must demonstrate that the conflict "affected counsel's performance—as opposed to a mere theoretical division of loyalties.'"

- 15 -

<u>Dhaliwal</u>, 150 Wn.2d at 570 (quoting <u>Mickens v. Taylor</u>, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)).  No such demonstration has been made here.

Wood argues Peale's disclosure affected his representation because it made him into a necessary defense witness who could have been called to testify at trial.  RPC 3.7(a) prohibits an attorney from acting as an advocate in a trial in which the lawyer "is likely to be a necessary witness."  But this rule also allows a lawyer to testify about an uncontested issue.  RPC 3.7(a)(1).  Here, Peale could have testified that he received the letter directly from Tisdale and Wood never received it because the State did not contest these facts.  Had this testimony been beneficial to Wood, Peale could have been a witness without violating RPC 3.7.

Moreover, the trial court eliminated the problem by excluding the Tisdale Letter and accepting the State's agreement that it would not elicit any information about it at trial.  There was nothing exculpatory in the letter and, once it was excluded in the State's case, we can see no reason why Wood would have wanted to present this evidence in his defense.  At that point, Peale was not a necessary witness and, as the trial court noted, any conflict of interest was eliminated.  And the jury did acquit Wood of the witness intimidation charge.

Wood contends that Peale would have been an important witness as to Wood's lack of intent on the two solicitation charges.  But Wood fails to explain the nexus between Peale's knowledge about the Baldonado affidavit and Tisdale Letter and Wood's state of mind when he recruited Baldonado to kidnap and murder K.M. a year earlier.  Peale had personal knowledge as to how the affidavit and letter came to be in the State's possession and he had personal knowledge

that Wood did not receive these documents from Tisdale. But Peale had no personal knowledge as to what Wood intended when he talked to Baldonado about K.M.

Finally, Wood maintains Peale should have been permitted to withdraw because Wood lost confidence in Peale's ability to represent him. But a general loss of confidence or trust alone is insufficient to justify granting a motion to withdraw. State v. Stenson, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997). At the time of Wood's request, the case had been pending for two and a half years, a jury had been empaneled, and jurors had heard three days of testimony. The trial court explored the nature of the alleged conflict and concluded that there was no significant risk that Peale's ability to represent Wood would be impacted or that Wood would otherwise be adversely affected. Because there was no conflict of interest, and no demonstrated impact on Peale's representation of Wood at trial, we conclude Wood was not denied his Sixth Amendment right to effective assistance of counsel.

## 2. Severance

Wood next argues the trial court improperly denied his motion to sever the rape charge from the remaining charges against him. We disagree.

We review a trial court's ruling on a severance motion for abuse of discretion. State v. Nguyen, 10 Wn. App. 2d 797, 814, 450 P.3d 630 (2019) (citing State v. Bythrow, 114 Wn.2d 713, 717-18, 790 P.2d 154 (1990)). CrR 4.3(a) permits joinder of charges where the offenses are of the same or similar character, based on the same conduct, or are part of a single scheme or plan. State v.

Bluford, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017). Generally, joint trials are preferred over separate trials. State v. Dent, 123 Wn.2d 467, 484, 869 P.2d 392 (1994). Offenses properly joined under CrR 4.3(a) may be severed if "the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b).

A defendant seeking severance must show that a trial on all counts "would be so manifestly prejudicial as to outweigh the concern for judicial economy." Bythrow, 114 Wn.2d at 718. To determine whether to sever charges to avoid prejudice to a defendant, the trial court must consider "(1) the strength of the State's evidence on each count; (2) the clarity of the defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial." State v. Slater, 197 Wn.2d 660, 677, 486 P.3d 873 (2021) (quoting State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994)). The court then weighs the prejudice to the defendant against judicial economy. Russell, 125 Wn.2d at 63.

Here, the trial court did not abuse its discretion in concluding that these factors weighed against severance. First, the State's evidence on each of the counts appeared to be of equivalent strength. The rape count was supported by undisputed evidence that Wood and K.M. had had sexual intercourse. That the sex was not consensual and the result of forcible compulsion was supported by the testimony of K.M. and Mohamed, the forensic nurse's examination of K.M., and the photographic evidence of K.M.'s injuries.

The solicitation charges were supported by Baldonado's testimony, the actual handwritten notes instructing Baldonado on how to kill or kidnap K.M., expert forensic handwriting analysis linking these notes to Wood, jail phone calls between Wood and Malone in which they discussed paying Baldonado's bail, and bail records showing Malone's subsequent payment.

Finally, the conspiracy to commit witness intimidation charge was supported by evidence that Wood wrote a letter to Tisdale asking for his help and identifying Baldonado as a "rat," Baldonado's testimony of events leading up to his execution of the affidavit, and telephone calls between Tisdale and Malone in which they discussed the recantation.

We cannot say that the weight of the evidence of some of the crimes was clearly stronger than others. While K.M.'s credibility was an issue as to the rape case, Baldonado's credibility was an issue as to the other charges. The trial court did not abuse its discretion by concluding that the first factor weighed against severance. Russell, 125 Wn.2d at 64 (where strength of evidence of each count is similar, factor weighs against severance).

Next, Wood asserts that his defenses were inconsistent. A defendant may demonstrate prejudice by showing "'antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive.'" State v. Sublett, 156 Wn. App. 160, 180, 231 P.3d 231 (2010) (quoting United States v. Oglesby, 764 F.2d 1273, 1276 (7th Cir. 1985)). Wood has not made such a showing.

Wood's defense to the rape charge was that he and K.M. engaged in consensual intercourse. Wood generally denied the remaining charges and

argued that, with regard to the solicitation charges, he had not made a serious request to harm K.M. With regard to the witness intimidation charge, he argued he had no involvement in convincing Baldonado to retract his testimony. Each of these defenses could be equally true. The trial court was well within its discretion to conclude that these defenses were not inconsistent, antagonistic, irreconcilable or mutually exclusive.[7]

Third, the jury was instructed that it had to decide each count separately and its verdict on one count could not control its verdict on any other count. Wood argues that, despite this instruction, the jury likely used evidence of one of the charged crimes to infer guilt on the others because the trial was so long, the court did not instruct the jury it should not consider evidence of one charge as evidence establishing Wood's guilt on the other charges, and evidence of the solicitation and witness intimidation charges was admitted for the purpose of showing Wood's consciousness of guilt as to the rape. But the record demonstrates that the jury did consider each count separately. The jury only convicted Wood of the two solicitation offenses, acquitted him of conspiracy to commit witness intimidation, and deadlocked on the rape charge.

Finally, the trial court did not err in concluding that evidence of each crime was admissible to prove the elements of the others. Wood contends that severance was required because evidence of the solicitation and conspiracy

---

[7] Wood further asserts that, because of his counsel's actual conflict of interest, he was "denied a vital opportunity to explore his lack of intent" as to the solicitation and witness intimidation charges. But we have concluded there was no actual conflict of interest. And even assuming that there was a possible conflict, we cannot see how it limited his ability to deny having the intent to kidnap or kill K.M. or the intent to force Baldonado to recant. Wood has not demonstrated that he was prevented from raising any proposed defense to any charge.

charges would have been inadmissible in a separate rape trial. Each crime, however, was admissible to establish consciousness of guilt as to the preceding crimes. Under ER 404(b), evidence of other crimes, wrongs, and acts is admissible as proof of motive, intent, or knowledge. The evidence of the alleged rape was admissible to demonstrate Wood's motive for solicitation and witness intimidation. State v. Sanders, 66 Wn. App. 878, 885, 833 P.2d 452 (1992) ("[T]he fact of the rape charge would be relevant in a separate trial on the witness tampering to show why the tampering occurred."). Furthermore, "[i]t is well settled that evidence of witness tampering is admissible as evidence of consciousness of guilt in the trial of the charge to which the witness's testimony pertains." State v. Rodriguez, 163 Wn. App. 215, 228, 259 P.3d 1145 (2011). Wood's attempt to have Baldonado prevent K.M. from testifying could reasonably be considered demonstrative of his consciousness of his guilt of the rape of K.M.

Even if evidence of the solicitation and conspiracy charges were not admissible against the rape charge, a lack of cross admissibility does not automatically mean that the charges must be severed. See Bluford, 188 Wn.2d at 315. The defendant must still show that the prejudicial effect of trying the charges together outweighed the need for judicial economy. Id. Wood cannot demonstrate prejudice from the trial court's failure to sever the charges—the jury did not convict Wood of rape. He actually got the remedy he sought in his severance motion—the opportunity to have a separate trial on the rape charge. Had he not chosen to plead guilty to assault in the third degree, he would have had a separate trial.

Because all factors weighed against severance and Wood has failed to demonstrate prejudice, the trial court did not abuse its discretion by denying Wood's motion to sever.

3. Motion to Reopen Defense Case

Wood next contends that the trial court infringed his constitutional right to testify when, after agreeing that Wood could take the stand and limit his testimony to the rape charge, it then denied his request to reopen the defense case to allow him to testify about the solicitation charges.

"'A motion to reopen a proceeding for the purpose of introducing additional evidence is addressed to the sound discretion of the trial court.'" State v. Luvene, 127 Wn.2d 690, 711, 903 P.2d 960 (1995) (quoting State v. Sanchez, 60 Wn. App. 687, 696, 806 P.2d 782 (1991)). To demonstrate reversible error based on a trial court's ruling on a motion to reopen, the appealing party must show both a manifest abuse of discretion and resulting prejudice. State v. Brinkley, 66 Wn. App. 844, 848, 837 P.2d 20 (1992). A trial court abuses its discretion if its decision is based on untenable grounds or untenable reasons. Sanchez, 60 Wn. App. at 696.

Defendants have a right to testify at trial. Rock v. Arkansas, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); State v. Lee, 12 Wn. App. 2d 378, 387, 460 P.3d 701, review denied, 195 Wn.2d 1032, 468 P.3d 622 (2020). Wood exercised this right but chose to limit his testimony to the alleged rape. After the State and Wood both rested, Wood changed his mind and asked the court to reopen his case to allow him to testify as to the solicitation charges. The trial court denied Wood's motion, finding that reopening the case would prejudice the State

- 22 -

because it framed its cross-examination of Wood based on his decision to limit his testimony and it was unable to call rebuttal witnesses, including Baldonado. The trial court further noted that, in the two and a half years that the case had been pending, Wood had plenty of time to consider whether he would testify and had been afforded the opportunity to offer "carefully crafted" testimony. The court ultimately ruled that his request was "too late and prejudicial to the State."

The trial court's ruling was supported by tenable reasons. State v. Barnett, 104 Wn. App. 191, 16 P.3d 74 (2001), abrogated on other grounds by State v. Epefanio, 156 Wn. App. 378, 234 P.3d 253 (2010), is instructive. In that case, the trial court explained the right to testify to the defendant, who then made the decision not to exercise that right. Id. at 197. The defense then rested. Id. The following morning, when the court was prepared to instruct the jury and move to closing arguments, the defendant asked if the court would allow him to testify, explaining that he had been overly emotional the day before. Id. at 197-98. The trial court refused to reopen the defense case, concluding that the defendant's decision to testify had been thoroughly explored before he had made his decision. Id. at 198. This court affirmed, concluding the trial court's decision not to disrupt the trial schedule to accommodate the defendant was not an abuse of discretion. Id. at 199.

Barnett is analogous to this case. Here, as there, Wood made his request after both sides had rested and when the court was preparing to instruct the jury and move to closing arguments. Moreover, Wood had ample time to consider his right to testify and the scope of testimony he wanted to offer. And, unlike the

defendant in Barnett, Wood did in fact testify and was allowed to limit that testimony to only one charge. See also United States v. Orozco, 764 F.3d 997 (9th Cir. 2014) (affirming denial of defense request to permit defendant to testify after both sides rested and prosecutor had made closing argument).[8]

Wood argues that the trial court's reasons for denying his request are unsupported by the record. He contends that the court could have granted the State time to prepare because the jury was available for several more days and that the State presented no evidence on how much time it would need to recall Baldonado. But Wood does not dispute that allowing Wood to retake the stand would have led to a delay in concluding the trial and would have required some level of effort by the State to deal with Wood's untimely request. Wood concedes that "allowing the defense to reopen its case would likely have caused some inconvenience and trial delays for both parties." The record thus supports the trial court's finding of delay and prejudice to the State. The trial court did not abuse its discretion in rejecting Wood's motion to reopen the defense case.

4. Prosecutorial Misconduct

Wood next contends that the prosecutor committed misconduct during closing argument. We reject this argument.

A defendant alleging prosecutorial misconduct has the burden of proving that the conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d

---

[8] In a Statement of Additional Grounds, Wood argues he was denied the opportunity to provide an "offer of proof" of why Wood felt the testimony was vital. This is unsupported by the record. Wood's counsel explained that Wood wished to testify to the solicitation charges because he felt it was necessary to articulate a viable defense. Thus, the court knew what testimony was to be offered and why. Moreover, the court allowed both sides ample opportunity to argue the issue before rendering its ruling.

741, 756, 278 P.3d 653 (2012). If the defendant objected at trial, he must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. Id. at 760. If the defendant did not object, any error is waived unless the prosecutor's conduct was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Id. at 760-61. In the latter case, the defendant must show that (1) no curative instruction would have alleviated any prejudicial effect on the jury and (2) the misconduct resulting in prejudice had a substantial likelihood of affecting the jury's verdict. Id. at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

During closing, the prosecutor told the jury that its job included assessing witness credibility. He addressed Wood's testimony and argued "[t]he defendant offered his version of what happened with respect to Count I. And I want to propose this: In order for you to accept as true the things that the defendant said, the following must also be true: That Mohamed was lying." The prosecutor reiterated this theme with each of the witnesses associated with the rape charge:

> If the defendant is telling the truth, then Rick Walton must also be lying.
>      . . . .
> If Mr. Wood is telling the truth, then [K.M.] must be lying.
>      . . . .
> If what the defendant says is true, then Deputy Moe must be lying.
>      . . . .
> Do you find him more credible? Is what he's saying true, or the alternative, are Mohamed, Rick Walton, [K.M.], and Deputy Moe all lying?

At no point did defense counsel object.

At the end of his argument, the prosecutor summarized the testimony of each of the witnesses, whom he described as "characters," and argued

- 25 -

[T]hese individuals, these unlikely heroes likely saved [K.M.]'s life. What a fascinating story this is. It is a true crime story with tears and blood and violence and lives that were and will be changed forever.

But this story isn't over yet. The last chapter remains to be written, and that responsibility falls to you. Is there any question about how this story ends?

There aren't any more plot twists, but there is a final and certain resolution. Not a happy ending for anyone, but certainty. A resolution. Ladies and gentlemen, the evidence in this case supports only one conclusion and that is that the defendant, Jerry George Wood, junior, is guilty beyond any reasonable doubt of all four counts as charged.

Wood first argues that the prosecutor undermined the presumption of innocence and shifted the burden of proof by arguing that the jury must find the State's witnesses are lying in order to acquit the defendant. Relying on State v. Fleming, 83 Wn. App. 209, 214, 921 P.2d 1076 (1996) and State v. Miles, 139 Wn. App. 879, 889, 162 P.3d 1169 (2007), Wood contends the prosecutor presented the jury with a false choice by informing it that to acquit Wood, it had to find that the State's witnesses were lying. The record does not support Wood's characterization of the prosecutor's comments.

In Fleming, during closing arguments the prosecutor stated that "for [the jury] to find the defendants . . . not guilty of the crime of rape in the second degree . . . you would have to find either that [the victim] has lied about what occurred in that bedroom or that she was confused." 83 Wn. App. at 213. On appeal, we concluded this argument was improper because it misstated the law and misrepresented both the role of the jury and the burden of proof. Id. The court explained that "[t]he jury would not have had to find that [the victim] was mistaken

or lying in order to acquit; instead, it was <u>required</u> to acquit <u>unless</u> it had an abiding conviction in the truth of her testimony." <u>Id.</u>

In <u>Miles</u>, the prosecutor told the jury that it had heard "mutually exclusive" versions of events and explained to them that "if one is true, the other cannot be. . . . If the State's witnesses are correct, the defense witnesses could not be and vice versa." 139 Wn. App. at 889. He argued that the jury had "no choice because you have two conflicting versions of events. One is not being candid with you . . . ." <u>Id.</u> at 890. Division Two reversed, concluding that the prosecutor's statements presented the jury with false choice because it did not have to believe the defendant's testimony to acquit him; it could have found reasonable doubt even if it did not believe Miles's version of events. <u>Id.</u> at 890.

But in <u>State v. Rafay</u>, 168 Wn. App. 734, 837, 285 P.3d 83 (2012), this court distinguished the improper comments in <u>Fleming</u> from a closing argument in which a prosecutor points out that a defendant's testimony is fundamentally and obviously different from the testimony of State witnesses. In that case, the prosecutor argued that "[y]ou must either believe everything [the defendant] told you in order for this unbelievable story of his to be true, or it seems to me you have to believe what [the State witnesses] told you . . . ." <u>Id.</u> at 836. This court held that this argument was proper because "when the parties present the jury 'with conflicting versions of the facts and the credibility of witnesses is a central issue, there is nothing misleading or unfair in stating the obvious: that if the jury accepts one version of the facts, it must necessarily reject the other.'" <u>Id.</u> at 837 (quoting <u>State v. Wright</u>, 76 Wn. App. 811, 825, 888 P.2d 1214 (1995)).

The prosecutor's argument here is more analogous to the arguments deemed proper in <u>Rafay</u> than the arguments found to be improper in <u>Fleming</u> and <u>Miles</u>. The prosecutor did not argue that the jury could acquit Wood only if they found the State's witnesses to be lying. Instead, the prosecutor merely pointed out the obvious: if the jury accepted Wood's version of the facts, it must reject the conflicting versions presented by the State's witnesses.

Even if the comments were improper, Wood cannot demonstrate prejudice. The witnesses referred to by the prosecutor—Mohamed, Walton, K.M., Deputy Moe—testified only as to the rape charges. Because the jury did not convict Wood of rape, the prosecutor's comments could not have prejudiced him.

Wood next asserts that the prosecutor "trivialized the State's burden of proof and attempted to fan the flames of passion in the jury by arguing that a guilty verdict was necessary to end the 'true crime story' and provide closure for 'the unlikely heroes in the story.'" Wood argues these statements "served no function other than to inflame the passions of the jury" and "encouraged the jury to render a guilty verdict, not based on a finding the State had met its burden of proof, but because it had a responsibility to end the 'true crime story.'"

We cannot conclude that these statements, in context, were improper. Both parties invoked the theme that the case was a story for which the jury would write the ending. During opening statements, defense counsel likened the jury's job to a book review and said that it would "come to the last page of your book and write in it, my review is that the State has failed to prove its case." In closing, defense

- 28 -

counsel reiterated that "[b]oth counsel have described to you that this is a kind of mystery story."

This argument was merely an illustrative vehicle through which both counsel explained to the jury that they were responsible for deciding whether the State had proven that Wood was guilty beyond reasonable doubt. Wood cites no authority to support his contention that this analogy "evoke[d] a sense of community fear that if the jury acquitted Wood, Jr., it would deny everyone the closure they were due and promote lawlessness." Wood has failed to show that the prosecutor committed any misconduct or that any of the arguments prejudiced him at trial.[9]

5. Cumulative Error

Wood next argues that the cumulative effect of all the alleged errors he has raised on appeal compounded their prejudicial effect and deprived him of a fair trial. The cumulative error doctrine applies "when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because Wood has failed to demonstrate any trial errors, he has not demonstrated cumulative error warranting a reversal of his convictions.

6. Motion for a New Trial

Wood argues that the trial court abused its discretion in denying his motion for a new trial based on exculpatory evidence he claimed he discovered after trial.

---

[9] Wood further argues that, if his prosecutorial misconduct claim fails for lack of objection, then his counsel was ineffective for failing to take such action. When the challenged statements were not improper, defense counsel's failure to object cannot constitute deficient performance. State v. Beasley, 126 Wn. App. 670, 687-89, 109 P.3d 849 (2005).

- 29 -

Under CrR 7.8(b)(2), the trial court may order a new trial on the basis of newly discovered evidence. The moving party must demonstrate that the evidence in question "(1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching." State v. Slanaker, 58 Wn. App. 161, 163, 791 P.2d 575 (1990) (quoting State v. Williams, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)). The absence of any of these factors is grounds to deny a new trial. State v. Statler, 160 Wn. App. 622, 632, 248 P.3d 165 (2011).

We review the decision to deny a new trial for abuse of discretion. State v. Gassman, 160 Wn. App. 600, 608, 248 P.3d 155 (2011). If the trial court makes findings of fact in denying a motion for a new trial, our review of those facts is limited to whether they are supported by substantial evidence. State v. Macon, 128 Wn.2d 784, 799, 911 P.2d 1004 (1996). We then determine if the findings of fact support the trial court's conclusions of law. Id.

A month after Wood was sentenced, he moved for a new trial under CrR 7.5 and CrR 7.8. According to Peale's declaration submitted with the motion, Wood told his defense team that he had retracted his request to Baldonado to harm K.M. before Baldonado left the jail. The defense team attempted to locate inmates who might have overheard this retraction. It obtained a court order directing the jail to disclose identification, location, and booking photographs of certain inmates housed near Wood in the hole. Through a process of elimination, they identified Raymond Ruiz as someone who may have been in a position to

hear the alleged retraction. The defense team was unable to locate Ruiz. But, as they learned after trial, Ruiz was in the Snohomish County Jail for six months before and during Wood's trial.

After sentencing, Wood saw Ruiz in the jail. Counsel searched court calendars, trial assignments, and the inmate roster and discovered that Ruiz was in custody. The defense investigator, Bryson Alden, interviewed Ruiz, who heard Wood and Baldonado discussing some type of deal and then claimed he heard Wood tell Baldonado that he had changed his mind and heard Baldonado acknowledge Wood's comment.

The trial court denied Wood's motion for a new trial, concluding "the proffered evidence would not probably change the result of the trial, the evidence was not discovered since trial, the evidence could have been discovered before trial by exercise of due diligence, and the evidence is merely impeaching."

Wood first argues that Ruiz's testimony probably would have changed the result of the trial. When considering whether newly discovered evidence will probably change the trial's outcome, the trial court considers the credibility, significance, and cogency of the proffered evidence. State v. Barry, 25 Wn. App. 751, 758, 611 P.2d 1262 (1980). The court may use the knowledge it gained regarding the evidence by presiding at trial. Id. at 758-59. In evaluating the probative force of newly presented evidence, the court may consider how the timing of the submission and the likely credibility of the witness bear on the probable reliability of that evidence. State v. Riofta, 166 Wn.2d 358, 372, 209 P.3d

- 31 -

467 (2009) (quoting Schlup v. Delo, 513 U.S. 298, 332, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)).

Here, the trial court found that the new evidence proffered by Wood was not credible and "that it is improbable that this evidence, if presented to the jury, would have changed the result of the trial." This finding is supported by the record. First, Riuz's statement that he heard Wood retract his deal with Baldonado came some two years after the event. Second, Detective Betts concluded that, based on Ruiz's location in the housing unit, it was highly unlikely Ruiz could have overheard Wood and Baldonado converse; Wood would have had to shout in order for Ruiz to hear him, in which case other witnesses—including corrections officers—would also have heard his statements to Baldonado. Finally, Baldonado testified that Wood never retracted his request for help in incapacitating K.M. The trial court could reasonably decide that Baldonado's testimony was more credible than that of Ruiz. Based on the suspect reliability of Ruiz's story, the trial court did not err in finding his testimony lacked credibility and was unlikely to have affected the jury's verdicts.

Next, Wood contends that Ruiz's testimony was newly discovered because the defense team did not discover Ruiz's identity or location before trial and it could not have discovered it through due diligence.

Here, the court found that the evidence was not newly discovered because

Months before trial the defendant claimed that he had retracted his solicitation of [Baldonado] and months before trial the defendant had identified Ruiz as a person who may have overheard his retraction. The fact that Ruiz only confirmed that information when interviewed by the defense investigator more than a month after trial does not mean that the evidence was only then "newly discovered."

This finding is supported by Peale's declaration in which he testified that they had identified Ruiz as a potential witness to the alleged retraction months before trial occurred.

Wood argues that even though they were aware that Ruiz might have exculpatory testimony, they could not locate him before trial to verify that fact. "A previously known witness' testimony can be newly discovered when that witness could not be located before trial with the exercise of due diligence." Slanaker, 58 Wn. App. at 166. But the determination of whether a party exercised due diligence is a finding of ultimate fact and not a conclusion of law. Id. at n.3 (citing State v. Fackrell, 44 Wn.2d 874, 880, 271 P.2d 679 (1954)).

Here, the trial court found that Wood had not exercised due diligence in attempting to locate and interview Ruiz before trial. The court found that, prior to January 2019, Ruiz was in custody in the Snohomish County Jail from July 2017 to February 2018, from June to August 2018, from August to September 2018, from October to December 2018, and from April 2019 to mid-March 2020. The court also found that Ruiz and Wood were housed in the same jail for six months leading up to and during Wood's trial. While Peale testified that his team searched "out of custody history and address information" for Ruiz, the court found he provided no more specific explanation of what efforts he undertook to locate Ruiz. And the court found that counsel made no efforts to locate Ruiz between January and October 2019.

These findings are supported by Peale's declaration and by the inmate housing reports that the State submitted to the court in response to the motion for

a new trial. The trial court's finding that Wood did not exercise due diligence in attempting to locate and interview Ruiz before trial is supported by substantial evidence.[10] The trial court did not abuse its discretion in denying Wood's motion for a new trial.

7. Ineffective Assistance of Counsel

Wood alternatively contends that his attorney's failure to exercise due diligence in searching for Ruiz constitutes ineffective assistance of counsel.

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, a defendant in a criminal proceeding is guaranteed the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To establish ineffective assistance of counsel, a defendant must demonstrate both (1) that counsel's representation fell below an objective standard of reasonableness and (2) that counsel's representation resulted in prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Because the defendant must show both prongs, a failure to demonstrate either

---

[10] Wood further argues that the trial court erred in concluding that Ruiz's testimony was merely impeaching because it negated the State's allegation that he solicited Baldonado with the intent to facilitate the murder or kidnapping offenses. The State concedes that if this evidence were admissible as circumstantial evidence of Wood's state of mind, it would not be merely impeaching. The State, however, contends the trial court made an "implicit evidentiary ruling" that Ruiz's testimony would have been inadmissible to prove Wood's state of mind under State v. Stubsjoen, 48 Wn. App. 139, 738 P.2d 306 (1987). Because Wood has failed to demonstrate the trial court abused its discretion in analyzing the first three factors, we need not decide whether the trial court correctly concluded that the evidence was merely impeaching.

prong will end the inquiry. State v. Classen, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

Deficient performance occurs when counsel's performance cannot be attributed to any conceivable legitimate tactic. State v. Carson, 184 Wn.2d 207, 218, 357 P.3d 1064 (2015) (quoting Grier, 171 Wn.2d at 33). There is a strong presumption that counsel exercised reasonable professional judgment to render adequate assistance. Id. at 216. To rebut this presumption, the defendant has the burden to establish that there are no legitimate strategic or tactical reasons explaining counsel's performance. McFarland, 127 Wn.2d at 335-36.

Wood argues that the failure to exercise due diligence in searching for a potential witness is deficient performance. The State, by contrast, argues that defense counsel made a reasonable, tactical decision to prioritize his time and resources on other aspects of Wood's defense. We agree with the State.

Wood relies on State v. Jones, 183 Wn.2d 327, 352 P.3d 776 (2015), for the proposition that a lawyer's failure to interview a witness amounts to deficient performance. But Jones is distinguishable. In that case, Jones was convicted of second degree assault after he fought with another man on a public street. Id. at 330. Defense counsel failed to interview several eyewitnesses who were clearly identified in police reports and pretrial discovery. Id. at 332.

On appeal, the Washington Supreme Court concluded that "failure to interview a particular witness can certainly constitute deficient performance" but that it depends on the lawyer's reasons. Id. at 340. Because trial counsel "offered absolutely no reason" for failing to interview the witnesses, his decision was not

informed and, therefore, could not have been strategic.  Id. at 340, 342.  It concluded the attorney's performance was deficient.

Here, Ruiz was not identified in any police reports, and his location and contact information were not readily available to Wood's defense team.  When counsel and his investigator were unable to find Ruiz, counsel made an informed choice to focus their resources on locating witnesses to the rape charge.  Counsel did so because he considered the rape charge to be "the more serious one, and we thought it required more effort."

This was a reasonable strategic move.  Rape in the second degree is a class A felony, RCW 9A.44.050(2), and a "sex offense" subject to an indeterminate sentence with a mandatory maximum sentence of life in prison.  RCW 9.94A.507(1)(a)(i); (3)(a), (b); RCW 9A.20.021(1)(a).  Wood would have served a life sentence with the possibility, but no guaranty, of an earlier release.  While solicitation to commit murder in the first degree is also a class A felony under RCW 9A.28.030(2) and RCW 9A.28.020(3)(a), it is not subject to a mandatory life sentence.  Wood faced a standard range of 234 to 312 months in prison if convicted of this charge.[11]

As the Jones court noted, "[w]e can certainly defer to a trial lawyer's decision against calling witnesses if that lawyer investigated the case and made an informed and reasonable decision against conducting a particular interview or calling a particular witness."  183 Wn.2d at 340.  Here, defense counsel made an

---

[11] The State conceded that the two solicitation charges constituted the same criminal conduct and the sentences would run concurrent to each other.

informed and strategic decision, given the information available to him.  Therefore, we conclude his performance was not deficient and reject Wood's ineffective assistance of counsel claim.

8.  Comparability Analysis in Sentencing

Wood next contends the trial court miscalculated his offender score when it included out-of-state convictions without finding that those convictions were comparable to Washington offenses.  The State concedes the trial court erred in failing to make a comparability determination.  We accept the State's concession and remand for resentencing.[12]

"Out-of-state convictions for offenses shall be classified according to the comparable offense definitions and sentences provided by Washington law."  RCW 9.94A.525(3).  The foreign offense must be compared to a Washington statute in effect when the individual committed the foreign crime.  State v. Morley, 134 Wn.2d 588, 606, 952 P.2d 167 (1998).  If a prior foreign conviction is not comparable, the trial court may not count the conviction toward the offender score.  State v. Thiefault, 160 Wn.2d 409, 415, 158 P.3d 580 (2007).  The State bears the burden of establishing the comparability of out-of-state convictions.  State v. Ford, 137 Wn.2d 472, 479-80, 973 P.2d 452 (1999).

In this case, Wood had five prior felony convictions form New York, including one conviction for possession of a controlled substance.  The trial court

---

[12] In the alternative, Wood argues that he received ineffective assistance of counsel when defense counsel failed to object to the inclusion of his out-of-state convictions.  In light of the State's concession, we need not address this argument.

counted each of these convictions as one point in calculating Wood's offender score without conducting a comparability analysis.

Wood further argues that the trial court should not count his New York conviction for drug possession because, following State v. Blake, 197 Wn.2d 170, 481 P.3d 521 (2021), that conviction is no longer comparable to any valid Washington offense. "Because penalties imposed under the invalid statute are void, defendants who were sentenced based on an offender score that included prior convictions under this unconstitutional statute are entitled to resentencing." State v. Markovich, No. 82795-2-I, slip op. at 15 (Wash. Ct. App. Aug. 2, 2021).[13] In Markovich, we held that an out-of-state conviction comparable only to former RCW 69.50.4013(1) cannot be included in an offender score in light of Blake. On remand, the trial court should determine if Wood's New York drug possession conviction is comparable only to RCW 69.50.4013 and if so, exclude it from his revised offender score.[14]

We affirm Wood's convictions, reverse his sentence, and remand for resentencing consistent with this opinion.

_Andrus, A.C.J._

WE CONCUR:

_Bruman, J_        _Appelwick, J._

---

[13] http://www.courts.wa.gov/opinions/pdf/814231.pdf.
[14] Wood also asks this court to strike community custody supervision fees from his judgment and sentence. Because we remand this case for resentencing, we leave this issue for the trial court to address at that time.